**COMMONWEALTH of Pennsylvania**

v.

**Steven Michael TIELSCH, Appellant.**

Superior Court of Pennsylvania.

Argued June 20, 2006.

Filed Aug. 23, 2007.

Reargument Denied Nov. 1, 2007.

---

Candace Cain, Pittsburgh, for appellant.

Michael W. Streily, Deputy Dist. Atty. and Kevin McCarthy, Asst. Dist. Atty., Pittsburgh, for the Com., appellee.

BEFORE: BOWES, PANELLA, and POPOVICH, JJ.

OPINION BY PANELLA, J.:

¶ 1 Steven M. Tielsch, Appellant, brings this direct appeal from the judgment of sentence entered on November 13, 2002,[1] by the Court of Common Pleas of Allegheny County. He was sentenced to a term of imprisonment of ten to twenty years on a conviction for third-degree murder. This appeal is a result of the fourth jury trial convened to address the charges filed against Tielsch. After careful review of the claims raised by Tielsch, we affirm the comprehensive decision of the Honorable Lawrence J. O'Toole.

¶ 2 On April 17, 1986, Tielsch and Kevin Ohm were driving around the Squirrel Hill section of Pittsburgh in a black Corvette. At approximately 9:15 p.m., the victim, Neil S. Rosenbaum, a rabbinical student from Canada, was walking toward the intersection of Phillips and Pittcock Avenues when Tielsch and Ohm pulled up in the Corvette. The pair asked the victim for directions. As the victim approached the vehicle, Tielsch opened fire and shot the victim four to five times.[2] Immediately after the shooting, Tielsch and Ohm drove off. Shortly thereafter, before he passed away, the victim told Officer Albert Stegena that a black Corvette had pulled up to him and that two white males had been in the vehicle.

¶ 3 Although an intensive investigation took place, little was learned as to the killer's identity until early 1988 when representatives from the District Attorney's Office and the local police department met with Sanford Gordon. Gordon told the police that Tielsch had bragged about the killing while the two had been housed at the Allegheny County Jail.

¶ 4 Additional evidence came to the Commonwealth's attention through Michael Starr. While Starr was under federal indictment, he related to the authorities that he was involved in an incident in the summer of 1991. Starr had been at a nightclub in the Strip District of Pittsburgh when he got into an altercation with Tielsch. According to Starr, Tielsch eventually pulled his jacket to the side and exposed the butt of a gun to Starr, and said: "I wacked some Jew . f—k and I would have no trouble doing you too."

1. Although this Court received the trial court record on October 27, 2004, both parties filed numerous requests for extensions of time to file briefs.

2. The victim had bullet wounds to his chest, right elbow, right buttock, left buttock, and right wrist. Leon Rozin, M.D., the chief forensic pathologist for Allegheny County, testified that it was possible that the bullet which entered the victim's chest also caused the wound to the elbow. *See N.T.*, Trial 4, 9/4/02, at 218–219.

¶ 5 Tielsch was subsequently arrested for the victim's murder on February 17, 2000. On January 23, 2001, the first jury trial commenced. On February 13, 2001, the jury informed the trial court that it was hopelessly deadlocked; a mistrial was eventually declared. On November 26, 2001, the second jury trial began, but again the result was a mistrial due to a deadlocked jury. On May 13, 2002, the third jury trial began, but once again, the jury informed the trial court that it was deadlocked without hope for a unanimous verdict.

¶ 6 As stated above, this appeal is a result of the fourth jury trial, which began on August 27, 2002, and ended on September 13, 2002, when the jury returned its verdict finding Tielsch guilty of third-degree murder.[3]

¶ 7 Following his conviction at the fourth trial, Tielsch was sentenced, on November 13, 2002, to a term of imprisonment of ten to twenty years on the conviction for third-degree murder. This timely appeal followed.

¶ 8 On appeal, Tielsch raises arguments involving double jeopardy and due process violations, contends that evidentiary rulings by the trial court prohibited him from presenting exculpatory evidence, i.e., testimony that another man allegedly confessed to this murder,[4] and that the Commonwealth presented insufficient evidence to sustain his conviction. See Appellant's Brief, at 3.

¶ 9 In his first issue presented on appeal, Tielsch argues that the trial court erred in denying his motion to dismiss as he contends that any retrial was barred by the double jeopardy clause of the Pennsylvania Constitution[5] as interpreted in Commonwealth v. Smith, 532 Pa. 177, 615 A.2d 321 (1992). In Smith, our Supreme Court held that the double jeopardy clause of the Pennsylvania Constitution bars retrial when the Commonwealth specifically undertakes to prejudice the defendant to the point of denying him a fair trial. See id., 532 Pa. at 186, 615 A.2d at 325.[6] Tielsch

---

3. 18 PA. CONS.STAT. ANN. § 2502(c). "The elements of third-degree murder, as developed by case law, are a killing done with legal malice but without the specific intent to kill required in first-degree murder." Commonwealth v. Hill, 427 Pa.Super. 440, 629 A.2d 949, 951 (1993), appeal denied, 538 Pa. 609, 645 A.2d 1313 (1994). Malice is an essential element of third-degree murder, see Commonwealth v. Cruz–Centeno, 447 Pa.Super. 98, 668 A.2d 536, 539 (1995), appeal denied, 544 Pa. 653, 676 A.2d 1195 (1996), habeas corpus denied, Cruz–Centeno v. Zimmerman, 1997 WL 16626 (E.D.Pa. Jan. 14, 1997), aff'd, Cruz v. Commonwealth of Pennsylvania, 142 F.3d 427 (3d Cir.1998), and is the distinguishing factor between murder and manslaughter, see Commonwealth v. Smouse, 406 Pa.Super. 369, 594 A.2d 666, 671 (1991).

4. During a conference prior to the fourth trial, counsel for Tielsch asked the trial court to reconsider its decision from the previous trials in which it had refused Tielsch's request to present two witnesses, Charles Musselwhite and Stephanie Maddich, relating to alleged pretrial statements made by Charles Musselwhite. According to Tielsch, these two witnesses would have established that Charles Musselwhite had admitted to commission of the murder. The trial court refused to reconsider its decision and precluded the witnesses from testifying.

5. Article 1, Section 10 of the Pennsylvania Constitution provides: "No person shall, for the same offense, be twice put in jeopardy of life or limb...."

6. In the words of the Supreme Court of Pennsylvania:

[T]he double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair

argues that there were two incidents of Commonwealth misconduct which invoke the double jeopardy clause: (1) In the first trial, by the deliberate action of the assistant district attorney in falsely contending that records from the Pennsylvania Department of Transportation showed that Tielsch destroyed his Corvette following the murder; and (2) by representing that Michael Starr, a Commonwealth witness, received no benefit for his testimony.[7]

¶ 10 At the first trial, the Commonwealth introduced Exhibit 31, a certified copy of the title history of a 1977 Corvette, which indicated that the vehicle had been first titled in Pennsylvania on May 5, 1977, and registered to Tielsch, and that the registration had expired on April 30, 1986. During the Commonwealth's closing argument, the prosecutor told the jury that Exhibit 31 indicated that Tielsch's uncle, Francis Tielsch, an insurance agent, had the Corvette destroyed in 1998, thus evidencing actions taken to hide Tielsch's guilt. In so informing the jury, the prosecutor relied not on the actual exhibit, but a loose-leaf copy from a detective's file. It turned out that the page the prosecutor relied on was from another unrelated report. The prosecutor accordingly admit-

---

trial. Because the prosecutor's conduct in this case was intended to prejudice the defendant and thereby deny him a fair trial, appellant must be discharged on the grounds that his double jeopardy rights, as guaranteed by the Pennsylvania Constitution, would be violated by conducting a second trial.

*Smith*, 532 Pa. at 186, 615 A.2d at 325.

7. Tielsch also makes other arguments concerning specific allegations of Commonwealth misconduct. *See* Appellant's Brief, at 79–80. These specific instances are not contained in his statement of the question presented, thus we need not address them. *See* Pa.R.A.P., Rule 2116(a), 42 PA. CONS.STAT.ANN. ("[O]rdinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby.").

Notwithstanding the waiver of these arguments, we have closely reviewed Tielsch's brief and find these additional arguments to be without merit. Tielsch argues that at trial the prosecutor misused PennDOT records to inaccurately demonstrate that Tielsch had a suspended driver's license at the time of the murder. Tielsch further argues that the Commonwealth conceded this point in its closing argument and points our attention to the transcript of the third trial. *See N.T.*, Trial 3, 5/14/02, at 290. After a close review, it is clear that the certified record belies this contention, and the Commonwealth always maintained, based upon properly admitted evidence at trial, that Tielsch did not have a valid driver's license on the night of the shooting. *See id.*, at 289–291.

Tielsch also contends that the prosecutor, in his opening statement during the first trial, mischaracterized Tielsch's statement to the police when he blurted out, prior to being questioned, "I didn't kill that Jewish kid." Thus, Tielsch argues that the Commonwealth was attempting to show that Tielsch had a guilty conscience at the time of the initial questioning, and knew ahead of time that he was going to be questioned about the murder. Tielsch is correct in his assessment of the Commonwealth's comment; however, the prosecutor's remark was merely a permissible reference to the evidence presented at trial. A prosecutor's remarks are fair if they are supported by evidence or contain inferences reasonably derived from that evidence. Accordingly,

"[p]rosecutorial misconduct does not occur unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 316 (2002) (citing *Commonwealth v. Rizzuto*, 566 Pa. 40, 777 A.2d 1069 (2001)). Due to the nature of a criminal trial, both sides must be allowed reasonable latitude in presenting their cases to the jury. *See id.* A prosecutor's comments must be reviewed in the context in which they were made. *Commonwealth v. Smith*, 490 Pa. 380, 416 A.2d 986, 989 (1980).

*Commonwealth v. Robinson*, 583 Pa. 358, 371–372, 877 A.2d 433, 441 (2005).

ted his error after the mistake was discovered.

¶ 11 After Tielsch's motion for a mistrial was denied, the trial court appropriately provided a curative instruction to the jury telling them that "the parties agree that the insurance claim referred on that page of Exhibit 31 was actually made by Francis T. Tielsch on a Chrysler automobile" and to disregard the Commonwealth's comment that Tielsch's uncle had disposed of the vehicle. N.T., Trial 1, at 1842.

¶ 12 As Tielsch acknowledges in his brief, the prosecutor "claimed that he made an honest mistake due to confusion by a missing page in Exhibit 31." Appellant's Brief, at 77. Tielsch maintains, however, that the aforementioned conduct requires a new trial "as an experienced prosecutor ... knows" that the Vehicle Code requires that "the defendant would have had to put the title for the Corvette into his uncle's name or a salvor's name," in order for Tielsch's uncle to have arranged for the car to be destroyed. Appellant's Brief, at 77–78. Tielsch also notes that Francis Tielsch had been contacted by police investigators two times before the prosecutor made his final argument and had informed the police that he had not made a claim, nor had any claim been filed through his agency, for the Corvette.[8] *See id.*, at 77. In addition, Tielsch contends that the veteran prosecutor "knew *or should have known* that he could not utilize the loose leaf papers from a

detective's file...." Reply Brief, at 1 (emphasis added).

■ ¶ 13 The record simply does not support Tielsch's contention that the Commonwealth acted *intentionally* in describing Exhibit 31 to prejudice Tielsch. *See Smith,* 532 Pa. at 186, 615 A.2d at 325 (holding that the double jeopardy clause bars retrial when the Commonwealth "intentionally undertake[s] to prejudice the defendant to the point of the denial of a fair trial."). Although the prosecutor was mistaken in his assertion, there is absolutely no evidence of a deliberate misstatement. Tielsch's unsupported theory is insufficient to show a deliberate trial tactic adopted by the prosecutor. As such, Tielsch's claim fails. *See, e.g., Commonwealth v. Simmons,* 541 Pa. 211, 248, 662 A.2d 621, 639 (1995) (finding no prosecutorial misconduct where evidence did not show that misstatement of fact was deliberate);[9] *Commonwealth v. Brown,* 489 Pa. 285, 298–299, 414 A.2d 70, 77 (1980) (misstatement of fact by prosecutor in closing did not constitute error or warrant a new trial because evidence did not show that misstatement was deliberately done). Because we find no suggestion that the Commonwealth deliberately undertook trial strategies to prejudice Tielsch, we cannot conclude that any double jeopardy violation occurred in this regard.

■ ¶ 14 Tielsch also contends that the Commonwealth committed intentional misconduct when it represented that Michael Starr received no benefit for his testimo-

---

8. Tielsch seems to concede that the prosecutor was unaware of the police investigators' activity with regards to Francis Tielsch. *See* Appellant's Brief, at 22–23. In short, Tielsch does not claim that at trial the Commonwealth was aware of Francis Tielsch's statements to the police investigators.

9. In his statement of the question presented, Tielsch claims that this "misconduct ... continued through all four trials...." Appel-

lant's Brief, at 3. Tielsch, however, provides no citation to the notes of testimony where this alleged misconduct occurred in the other trials. Accordingly, there is no evidence of prohibited prosecutorial overreaching "designed to harass the defendant through successive prosecutions...." *Commonwealth v. Martorano,* 559 Pa. 533, 538, 741 A.2d 1221, 1223 (1999).

ny.[10] Specifically, Tielsch cites the following exchange from the first trial:

PROSECUTOR: Do you expect to gain anything by doing it [*i.e.,* testifying], sir?

STARR: No, sir. I already have my deal with the [g]overnment. It's been completed.

N.T., Trial 1, 2/5/01, at 1193.

¶ 15 Tielsch contends that the prosecutor

had to know that in just a few weeks Starr would be using the fact that he testified in the Tielsch homicide to gain a sentence reduction in federal court, including having prosecutor Fitzsimmons himself testify on his behalf. Instead of allowing the jury to hear Starr's expectation of what he had to gain, Fitzsimmons permitted Starr to deny any benefit, alerting no one.

Appellant's Brief, at 81 (citation omitted).

¶ 16 At trial, Starr noted that he had signed a plea agreement in federal court wherein he had agreed to testify against others in exchange for the government's commitment to review his actions and accordingly recommend a sentence reduction if appropriate. Starr also testified that as of the date of his testimony against Tielsch he was still awaiting the hearing on his request for reduction of sentence. Starr repeatedly denied, even during vigorous cross-examination, that his testimony against Tielsch was related in any way to his plea agreement. *See, e.g., N.T.,* Trial 1, 2/5/01, at 1231. In other words, the impetus for his testimony was that he was simply telling the truth and that he had nothing to gain.

¶ 17 Tielsch maintains that, nonetheless, the Commonwealth should have alerted the jury that Starr expected to benefit from his testimony. The courts have long recognized the responsibility of the prosecution to disclose a promise of leniency that is made to a witness to motivate testimony against an accused.

■ ¶ 18 In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court declared that due process is offended when the prosecution withholds evidence favorable to the accused. Exculpatory evidence

---

10. Michael Starr testified at the first and second trials that he did not receive any promise of leniency in his federal prosecution in exchange for this testimony against Tielsch. As correctly summarized by the trial judge:

Mr. Starr began cooperating with the federal authorities in 1997, shortly after is arrest on federal narcotics charges—years before the Defendant herein was arrested. Mr. Starr, in conjunction with his lawyer, negotiated and executed a plea agreement with the government in mid–1998, which included specific details as to his cooperation and what the government would do in exchange for his cooperation, none of which had anything to do with this case. Mr. Starr then went to federal prison to begin serving his sentence, during which time he continued to provide the federal authorities with information about other cases and narcotics trafficking. In early 2001, Mr. Starr contacted the warden at the institution indicating that he had some information on a pending homicide prosecution.

Eventually, the warden put Mr. Starr in touch with the prosecutor in this case, who spoke with him by telephone and then arranged for him to be transported to the Allegheny County Courthouse to testify. After Mr. Starr's testimony in the first trial, the prosecutor appeared at a hearing in federal court to confirm that Mr. Starr had willingly testified about an incident involving the Defendant, wherein the Defendant made a reference to killing a Jewish man. This testimony by the prosecutor in Mr. Starr's federal re-sentencing hearing was peripheral, at best. It was not part of his plea agreement with the federal government, nor was it part of the Motion filed on his behalf requesting a reduction in his sentence.

Trial Court Opinion, 6/28/04, at 9–10.

favorable to the accused is not confined to evidence that reflects upon the culpability of the defendant: "Exculpatory evidence also includes evidence of an impeachment nature that is material to the case against the accused." *Commonwealth v. Strong,* 563 Pa. 455, 462, 761 A.2d 1167, 1171 (2000). Our Pennsylvania Supreme Court has held that any implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility, and therefore constitutes *Brady* material. *See Commonwealth v. Champney,* 574 Pa. 435, 449, 832 A.2d 403, 412 (2003).

¶ 19 In *Commonwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167 (2000), the defendant, following his conviction of murder, produced evidence of communications between the prosecutor and a witness' attorney, including letters written prior to trial, referring to a negotiated deal. Our Supreme Court held that, regardless of any evidence of bad faith, the due process protections of *Brady* are implicated if there is an understanding of leniency between the Commonwealth and a witness. Therefore, a new trial was ordered because the understanding, even though not ironclad, was not brought to the defendant's attention prior to trial.

¶ 20 When we compare the disclosure made by the Commonwealth in this case with the facts supporting the Supreme Court's finding of a *Brady* violation in *Strong,* we are compelled to agree with the trial court that no relief is due Tielsch. In *Strong,* unbeknown to the defense, the witness' counsel had been in active negotiations with the Commonwealth, all prior to the trial. In the case now before us, we can find nothing in the record which indicates that the Commonwealth withheld any information about Starr's sentencing negotiations from Tielsch. Tielsch's trial counsel was provided with Starr's plea agreement and sentence, as well as the motion from his federal prosecution to reduce the sentence in light of Starr's cooperation in other cases. As a result of the disclosure, Tielsch's trial counsel vigorously cross-examined Starr regarding any possible motivation for his testimony in relation to the motion for a reduced sentence and later argued to the jury that they should reject Starr's testimony because of this perceived inducement. Tielsch's mere allegation that the assistant district attorney had promised to assist in Starr's efforts to gain a reduction in his federal sentence is not sufficient to establish that such an agreement in fact existed either before or at the time of trial. For example, in *Commonwealth v. Morales,* 549 Pa. 400, 414, 701 A.2d 516, 522–523 (1997), under similar circumstances, our Supreme Court stated: "[W]e decline to find that a *Brady* violation occurred since appellant offers nothing besides his mere conjecture that such an arrangement existed."

¶ 21 The Commonwealth was under no obligation to postulate alternative motivations for Starr's testimony. Based upon the disclosure by the Commonwealth, Tielsch's trial counsel meticulously cross-examined Starr with respect to the details of his plea agreement and his motivation for testifying. Therefore, the record supports no finding of prosecutorial misconduct in this respect.

■ ¶ 22 In his second issue presented on appeal, Tielsch argues that the trial court erred in preventing him from presenting exculpatory evidence that Charles Musselwhite was a suspect immediately following the homicide.

¶ 23 The factual background for this alleged exculpatory evidence consists of the following: Stephanie Maddich received a phone call on the night of the murder from her old boyfriend, Charles Musselwhite.

During the call, Musselwhite told her that he had been in a vehicle when another passenger shot someone in the Squirrel Hill section of Pittsburgh. Maddich's husband then contacted the Pittsburgh Police Department's Crime Stoppers program and reported the call from Musselwhite. Police investigators contacted Musselwhite on April 23, 1986, six days after the shooting; however, Musselwhite told the police that he had not been present at the time of the shooting. On May 13, 1986, police investigators again interviewed Musselwhite. This time, Musselwhite contradicted his earlier statement and told them that he had been present on the night of the murder and that he had seen another passenger in the vehicle shoot an individual whom he described as a rabbi or priest.

¶ 24 The police discounted Musselwhite's statement, and the investigation continued without Musselwhite's participation; however, police investigators again contacted Musselwhite in December 2001, and Musselwhite, who was in California at the time, admitted to the police that he had in fact called Maddich and told her, falsely, that he had committed the shooting, but that he had done so only to impress her. This was the third different version provided by Musselwhite.

¶ 25 At trial, Tielsch sought to present Maddich's testimony regarding the telephone call from Musselwhite to Maddich and sought to introduce Musselwhite's statements regarding the shooting.[11] Specifically, the proffer by Tielsch with respect to Musselwhite's testimony, as summarized by the trial court, was that "he gets on the stand, he is going to say, I said I killed the victim, but I didn't[.]" N.T., Trial 2, 12/4/01, at 1144. The trial court ruled that the proposed evidence constituted inadmissible hearsay. See id., at 1195–1197.

¶ 26 On appeal, Tielsch contends that the trial court erred as he had a fundamental right to present exculpatory evidence "even though some of the proffered testimony is hearsay." Appellant's Brief, at 85. Tielsch's argument centers on the contention that this alleged exculpatory evidence consisting of hearsay statements was per se admissible under the "United States Constitution, Fifth, Sixth and Fourteen Amendments and Pennsylvania Constitution, Article I, Sections 1, 9, 10 26 and 28 [sic]." Appellant's Brief, at 86.[12]

¶ 27 Our standard of review with respect to evidentiary rulings is well-settled: The trial court's rulings will not be disturbed absent an abuse of discretion. See Commonwealth v. Thompson, 779 A.2d 1195,

11. Tielsch first sought to introduce Maddich's and Musselwhite's testimony during the second trial. See N.T., Trial 2, 12/4/01, at 1142–1146. Tielsch again sought to introduce Maddich's and Musselwhite's testimony at the fourth trial as he filed a petition for reconsideration. See Petition for Reconsideration, filed 8/30/02. We note that all of the citations regarding the proposed testimony in Tielsch's briefs cite the notes of testimony from the second trial. See Appellant's Brief, at 82–86; Reply Brief, 11–13.

12. At trial, Tielsch argued that Musselwhite's statement to Maddich constituted an excited utterance and, thus, was within the purview of the excited utterance hearsay exception.

On appeal, however, Tielsch does not make that argument. See Appellant's Brief, at 82–86. It is axiomatic that the failure to present argument in a brief constitutes waiver of the claim on appeal. See, e.g., Commonwealth v. Sneddon, 738 A.2d 1026, 1028–1029 (Pa.Super.1999). In any event, we find no abuse of discretion in the trial court's decision to exclude Musselwhite's recanted statement. See Commonwealth v. Laudenberger, 715 A.2d 1156, 1163 (Pa.Super.1998) (explaining that an excited utterance is a "spontaneous declaration" made by a person whose mind has been "suddenly made subject to an overpowering emotion").

1200 (Pa.Super.2001), *appeal denied,* 567 Pa. 760, 790 A.2d 1016 (2001).

■ ¶ 28 "An accused has a fundamental right to present defensive evidence so long as such evidence is relevant and not excluded by an established evidentiary rule." *Commonwealth v. Seibert,* 799 A.2d 54, 67 (Pa.Super.2002) (internal quotation marks and citation omitted). *See also Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Furthermore, our Pennsylvania Supreme Court has observed that an accused exercising his or her right to present evidence "must comply with established rules of procedure and evidence...." *Commonwealth v. Bracero,* 515 Pa. 355, 363, 528 A.2d 936, 939 (1987) (quoting *Chambers,* 410 U.S. at 302, 93 S.Ct. 1038).

¶ 29 In the present case, Tielsch contends that application of the hearsay ruling in this case violated his due process rights. Citing to *Chambers* and *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), Tielsch maintains that Musselwhite's proposed testimony was admissible pursuant to what has been called the "due process exception" to the hearsay rule.

¶ 30 In *Chambers,* there were multiple confessions by another person to the murder for which Chambers was on trial. The confessor told three associates shortly after the shooting that he had fired the gun, and he subsequently gave a sworn confession to attorneys representing Chambers. The trial court excluded the statements to the three associates and, by invoking a "voucher" rule, made it impossible for Chambers to pierce the confessor's repudiation of his confession to the attorneys. The United States Supreme Court held that the Due Process Clause of the United States Constitution affords criminal defendants the right to introduce into evidence third parties' declarations against their own penal interest when the statements are made under circumstances that "[provide] considerable assurance of their reliability." 410 U.S. at 300, 93 S.Ct. 1038.

¶ 31 The Supreme Court held that the *assurance of reliability* was present under the facts in *Chambers,* as

> each of [the confessor's] confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case.... Third, ... each confession here was in a very real sense self-incriminatory and unquestionably against interest. Finally, if there was any question about the truthfulness of the extrajudicial statements, [the confessor] was present in the courtroom and was under oath.

*Id.,* at 300–301, 93 S.Ct. 1038. In consideration of the totality of these indicia of reliability, the Supreme Court held that the "mechanistic" application of Mississippi's rules of evidence by the trial court had deprived Chambers of his right to due process of law. *Id.,* at 302, 93 S.Ct. 1038.

¶ 32 In *Green,* the trial court excluded the out-of-court statement of a man who had already been convicted of capital murder for his role in the killing for which the defendant was being tried. The excluded statement, made spontaneously to a close friend, amounted to an admission that the declarant alone was responsible for the killing. The statement was excluded from Green's sentencing trial because of the lack of a hearsay exception for statements against penal interest in Georgia. *See* 442 U.S. at 99, 99 S.Ct. 2150.

¶ 33 Based on the "unique circumstances" present in *Green,* the United States Supreme Court held that the trial court properly applied its hearsay rule during the sentencing phase of a death penalty trial; however, this ruling never-

theless violated the Due Process Clause. *Id.,* at 95–97, 99 S.Ct. 2150. The Court found that "[t]he excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, and substantial reasons existed to assume its reliability." *Id.,* at 97, 99 S.Ct. 2150. Under such circumstances, the Court held that "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* (internal citations and quotation marks omitted).

¶ 34 In the matter currently before us, the trial court correctly assessed, unlike the situations in *Chambers* or *Green,* that there were no *assurances of reliability* to buttress the out of court statements. Unlike Tielsch's contention that the out of court statements would demonstrate that Musselwhite was the shooter, Maddich's proposed testimony was that Musselwhite had called her shortly after the murder to report that he had been present in the vehicle when the shooting had occurred, not that he had committed the murder himself. Furthermore, Musselwhite never confessed to the crime in any of the statements attributed to his conversations with the police. In his first interview with the police, he stated that he had not been present during the shooting. In his second interview, he stated that he had been present in the vehicle when another individual shot the "rabbi or priest." Finally, in 2001, Musselwhite admitted to the police that he had, in fact, called Maddich and told her that he was the shooter, but that he had been merely boasting to impress her.[13] Given the different and contradictory statements attributable to Musselwhite,

none of which consisted of a confession, we agree with the trial court that the proposed testimony presented a far different factual scenario than in *Chambers* or *Green,* and lacked the *assurances of reliability* as outlined by the United States Supreme Court.

¶ 35 Accordingly, we find that the trial court did not abuse its discretion in precluding the hearsay statements attributable to Musselwhite.

¶ 36 In his third issue presented on appeal, Tielsch contends that the near fourteen year delay in his prosecution resulted in the violation of his due process rights under the United States and Pennsylvania Constitutions.[14] Specifically, Tielsch contends that the delay resulted in the loss of witnesses and documents.

¶ 37 There is no statute of limitations for murder cases in Pennsylvania. *See* 42 PA. CONS.STAT.ANN. § 5551. Our Pennsylvania Supreme Court has held, however, that

statutes of limitation do not define the full extent of the rights of the accused concerning the time in which charges can be filed. The constitutional right to due process also protects defendants from having to defend stale charges, and criminal charges should be dismissed if improper pre-arrest delay causes prejudice to the defendant's right to a fair trial.

*Commonwealth v. Snyder,* 552 Pa. 44, 51–52, 713 A.2d 596, 599–600 (1998).

■ ¶ 38 To prevail on a claim of violation of due process based on pre-arrest delay, a defendant must first establish that

---

13. As noted, Maddich's proposed testimony differed from Musselwhite's third statement to the police in that Maddich recalled Musselwhite saying he was merely in the vehicle when another individual shot the victim, not that Musselwhite was the shooter.

14. We note that "the due process provision of the Pennsylvania Constitution does not provide greater protections than its federal counterpart." *Commonwealth v. Louden,* 569 Pa. 245, 250, 803 A.2d 1181, 1184 (2002). *See also Commonwealth v. Hall,* 574 Pa. 233, 247 n. 6, 830 A.2d 537, 546 n. 6 (2003).

the delay caused him actual prejudice. *See Commonwealth v. Louden,* 569 Pa. 245, 250, 803 A.2d 1181, 1184 (2002). In *Louden,* our Supreme Court explained that

> [i]n order for a defendant to show actual prejudice, he or she must show that he or she was meaningfully impaired in his or her ability to defend against the state's charges to such an extent that the disposition of the criminal proceedings was likely affected. *Jones v. Angelone,* 94 F.3d 900, 907 (4th Cir.1996). This kind of prejudice is commonly demonstrated by the loss of documentary evidence or the unavailability of a key witness. *United States v. Cornielle,* 171 F.3d 748, 752 (2d Cir.1999). It is not sufficient for a defendant to make speculative or conclusory claims of possible prejudice as a result of the passage of time. *United States v. Sturdy,* 207 F.3d 448, 452 (8th Cir.2000). When a defendant claims prejudice through the absence of witnesses, he or she must show in what specific manner missing witnesses would have aided the defense. *United States v. Trammell,* 133 F.3d 1343, 1351 (10th Cir.1998).... Furthermore, it is the defendant's burden to show that the lost testimony or information is not available through other means. *United States v. Rogers,* 118 F.3d 466, 475 (6th Cir.1997).

*Id.,* at 251, 803 A.2d at 1184 (quoting *Commonwealth v. Scher,* 569 Pa. 284, 314, 803 A.2d 1204, 1222 (2002) (*plurality*)).

¶ 39 Tielsch first asserts that he was prejudiced by the pre-arrest delay due to the death of John Mangino, Tielsch's uncle who died in 1994. At trial, Sanford Gordon testified that Tielsch told him that he was working on his uncle's apartment building, in the Squirrel Hill section of Pittsburgh, on April 17, 1986, the night of the murder. To corroborate Gordon's testimony, the Commonwealth offered evidence that Mangino purchased the apartment building on May 7, 1986, and proposed to the jury that Tielsch had been working on the property prior to the date of purchase. Tielsch contends that he wished to call Mangino as a witness to establish that he was not working on the property on the night of the murder, thus calling into question Gordon's testimony.[15] Tielsch, however, has not showed, or even alleged, that such evidence was not available through other means. As such, there was no demonstration of actual prejudice. *See Louden,* 569 Pa. at 251, 803 A.2d at 1184. *See also* 4 CRIMINAL PROCEDURE § 18.5 (2d ed.).

¶ 40 Tielsch next contends that he was prejudiced by the death of Kevin Ohm, who died in 1991. As stated above, Kevin Ohm was the man the Commonwealth contended was in the vehicle with Tielsch on the night of the murder. The record, however, indicates that Ohm gave a statement to the police in which he stated that he could not remember the night in question. The Commonwealth read this statement, without objection, during the hearing on

---

15. Tielsch also argues that he could have introduced the testimony of Ben Orringer and Bernice Orringer if the charges had been timely filed. The Orringers were the prior owners of the property, and Tielsch allegedly would have called them to testify that he was not at the property on the night of the murder; however, the Orringers are now both deceased. Appellant's Brief, at 88. Tielsch also notes that he could have called "a woman ... named Mrs. McWilliams" who lived on the street where the property was located to testify that he was not on the property on the night of the murder. *Id.* The certified record does not contain any assertion by Tielsch of his lost opportunity to call these witnesses. He made no mention of them during the hearing on his motion to dismiss due to pre-arrest delay. Accordingly, these claims are waived. *See* Pa.R.A.P., Rule 302(a), 42 PA. CONS.STAT. ANN.

Tielsch's motion to dismiss. *See N.T.,* Hearing, 11/27/00, at 22–23. In fact, Tielsch's counsel read from a report which Ohm's brother gave to the police in which Ohm's brother stated, "I wish I could tell you that Kevin told me about Stevie [Tielsch], but he didn't." *Id.,* at 26. Without a showing that Ohm would have provided any relevant evidence, we find that Tielsch did not establish actual prejudice with respect to the pretrial death, and thus unavailability, of Ohm.

¶ 41 Tielsch raises additional contentions, wherein he maintains actual prejudice was established. Preliminarily, we note that none of these contentions were raised during the hearing on his motion to dismiss or at any time thereafter in the trial court. As such, they are waived. *See* Pa.R.A.P., Rule 302(a), 42 Pa. Cons.Stat. Ann. In any event, Tielsch's contentions warrant no relief. Tielsch argues that three citations written by Trooper Timothy Wiles were "missing from trial due to the passage of time." Appellant's Brief, at 89. Tielsch, however, does not offer any support to his claim that the citations were lost due to pre-arrest delay.

¶ 42 Tielsch next contends that the Commonwealth failed to follow up on two other suspects, Frank Braddock and Musselwhite, and that "no investigation was done in 1996 as to the origins of the gun." Appellant's Brief, at 91. Tielsch also argues that "[k]ey witnesses" have died over the course of the four trials. Appellant's Brief, at 90. These assertions, however, do not raise issues concerning pre-arrest delay, and consequently, we need not address them.

¶ 43 We next address Tielsch's fourth issue presented on appeal in which he argues that his "unprecedented number of retrials" violates "the constitutional prohibition against double jeopardy, due process and equal protection." Appellant's Brief, at 92. In this issue, Tielsch makes sweeping allegations, such as "[e]ach one of Tielsch's [trials] was unfair in its own way. . . ." *Id.* Without providing detailed contentions, Tielsch invites this Court to review the circumstances of each trial and to find and then address each alleged inconsistency and error. *See, e.g.,* Appellant's Brief, at 93 (noting that at each trial there "were surprise witnesses and unexpected evidence and tactics to battle"). In this type of situation, we recall the words of our retired colleague, the Honorable Phyllis W. Beck, in *Commonwealth v. Hetzel,* 822 A.2d 747 (Pa.Super.2003), *appeal denied,* 576 Pa. 711, 839 A.2d 351 (2003), to the effect:

> It appears that [the appellant] expects this court to peruse the trial record, take note of each time she objected to photographic evidence, consider the arguments she made and the case law, if any, upon which she relied and determine whether any of those instances warrant appellate relief. Of course, the Rules of Appellate Procedure and case law interpreting them establish that under these circumstances, [the appellant] has waived her claim.

*Id.,* at 765 (citing, inter alia, Pa.R.A.P., Rule 2119(c), 42 Pa.Con.Stat.Ann.).

¶ 44 The thrust of Tielsch's argument seems to be that the evidence presented by the Commonwealth varied somewhat at each trial. For instance, Tielsch contends that the Commonwealth "used each new trial to hone the core evidence it presented" against him. Appellant's Brief, at 93. Tielsch, however, provides no valid citation to authority that renders his claim meritorious. Nor does he argue that the Commonwealth violated any specific rule of evidence in this regard. Therefore, these assertions are undeveloped and waived. *See Commonwealth v. Rivera,* 454 Pa.Su-

per. 451, 685 A.2d 1011 (1996) (undeveloped arguments will not be considered).

■ ¶ 45 In his final issue presented on appeal, Tielsch contends that the Commonwealth presented insufficient evidence to sustain his conviction for third-degree murder. We note that in evaluating a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. *See Commonwealth v. Wallace*, 817 A.2d 485, 490 (Pa.Super.2002), *appeal denied*, 574 Pa. 774, 833 A.2d 143 (2003).

■■ ¶ 46 We may not weigh the evidence and substitute our judgment for the fact-finder. *See Commonwealth v. Derr*, 841 A.2d 558, 560 (Pa.Super.2004). The fact-finder, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. *See Commonwealth v. Hunzer*, 868 A.2d 498, 505 (Pa.Super.2005), *appeal denied*, 584 Pa. 673, 880 A.2d 1237 (2005). To sustain a conviction, however, the facts and circumstances which the Commonwealth must prove must be such that every essential element of the crime is established beyond a reasonable doubt. *See Commonwealth v. Hargrave*, 745 A.2d 20, 22 (Pa.Super.2000), *appeal denied*, 563 Pa. 683, 760 A.2d 851 (2000).

■ ¶ 47 "Third degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." *Commonwealth v. Kling*, 731 A.2d 145, 147 (Pa.Super.1999), *appeal denied*, 560 Pa. 722, 745 A.2d 1219 (1999) (citing 18 Pa. Cons.Stat. Ann. § 2502(c)). "Malice exists where there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Id.*, at 147–148 (citation and quotation marks omitted).

¶ 48 Tielsch first contends that the evidence is legally insufficient by expounding, at length, on his assertion that the prosecution witnesses, Sanford Gordon and Michael Starr, were "unreliable." Appellant's Brief, at 95. In his brief, Tielsch repeatedly attacks the credibility of Gordon and Starr. This claim is "not properly before this Court because a determination of credibility, 'is within the sole province of the trier of fact who is free to believe all, part or none of the evidence.' " *Commonwealth v. Nelson*, 399 Pa.Super. 618, 582 A.2d 1115, 1118 (1990), *appeal denied*, 527 Pa. 664, 593 A.2d 840 (1991) (quoting *Commonwealth v. Jackson*, 506 Pa. 469, 475, 485 A.2d 1102, 1104–1105 (1984)).

¶ 49 Tielsch also contends that the evidence was insufficient because of the lack of evidence connecting him to the gun, and that the "one connection" that he had to the case was limited to his black corvette. We find that the evidence presented by the Commonwealth is sufficient to sustain Tielsch's conviction for third-degree murder.

¶ 50 The evidence at trial reveals that the victim told Officer Albert Stegena that a black Corvette pulled up to him and that two white males were in the vehicle. At the time of the shooting, the victim was wearing a dark coat, a fedora style hat, and had a beard. After the pair asked for directions, the victim was shot several times.

¶ 51 Gordon, who shared a jail cell with Tielsch in 1987, testified that Tielsch told him that he shot a rabbi in the Squirrel

Hill section of Pittsburgh. Gordon testified that Tielsch stated that he and "Kevin" were driving around and had been shooting at signs and that they had also smoked cocaine and taken percocet pills earlier that evening. Once they pulled alongside the victim, who Gordon noted Tielsch described as wearing "a beard, a funny hat and long black type robe," Tielsch opened fire. N.T., Trial 4, 9/4/02, at 247. Immediately after the shooting, the pair drove off.

¶ 52 The Commonwealth also presented the testimony of Starr. Starr testified that he was in a nightclub in 1991 when he got into an altercation with Tielsch. During the altercation, Starr testified that Tielsch stated, "I know you have a gun. I also have a gun. . . ." *Id.*, 9/5/02, at 671. Immediately thereafter, Tielsch also stated that he had "wacked some Jew f—k and I would have no trouble doing you too." *Id.*, at 672.

¶ 53 We find that the foregoing evidence constituted sufficient circumstantial evidence to support Tielsch's conviction for third-degree murder.

¶ 54 As we find no merit to any of the issues raised on appeal, we affirm the exemplary opinion of the Honorable Lawrence J. O'Toole. In light of the complexities of the constitutional issues raised herein, we commend counsel of record for both sides in the presentation of their legal arguments.

¶ 55 Judgment of sentence affirmed. Jurisdiction relinquished.

¶ 56 Judge BOWES files a dissenting opinion.

## DISSENTING OPINION BY BOWES, J.:

¶ 1 In my view, Appellant is entitled to a new trial due to the trial court's decision to preclude him from admitting evidence regarding hearsay statements made by Chuck Musselwhite indicating that either Musselwhite himself or someone with Musselwhite on the night in question killed the victim. Hence, I dissent.

¶ 2 Mr. Rosenblum was shot five times on a Pittsburgh street at approximately 9:15 p.m. on April 17, 1986, when he approached a vehicle after he was asked for directions. Before dying from his wounds, the victim described his shooter to police as a white male passenger in a black sports car being driven by another white male. The victim believed that the car was a Corvette because it had pop-up headlights, which was a feature that the Corvette shared with several other types of vehicles in 1986. There were no eyewitnesses, and the information from the victim was the only evidence, other than the bullets and casings, provided to police, who labored for years to solve the murder.[16]

¶ 3 The record indicates that three men elected to take credit for this crime, apparently to bolster their street credentials. Those men included Appellant, Chuck Musselwhite, and Frank Braddock, who drove a black Corvette and sported a tattoo of a swastika. Musselwhite was in the vicinity of the crime when it occurred and made two statements to third parties implicating himself as a witness to or participant in the crime. Eventually, Appellant was convicted on the basis of statements

---

16. The issue of whether pretrial delay should prevent prosecution of this matter has given me pause in light of Kevin Ohm's death as well as the loss of the identity of the confidential informant who told police that Braddock bragged about the killing. Nevertheless, the prejudice suffered by Appellant was not so substantial as to require dismissal of the charges especially since over the years, the Commonwealth endeavored to solve the crime with paltry evidence at its disposal.

that he made to two individuals, Sanford Gordon and Michael Starr. Appellant was tried four times, with the first trial ending in a mistrial. The next two trials resulted in hung juries. At the fourth trial, Appellant was convicted of third degree murder, which was obviously a compromise verdict given the nature of the murder.

¶ 4 Appellant contends that the trial court's refusal to admit evidence relating to Chuck Musselwhite denied him due process and requires either dismissal of the charges [17] or a new trial. Appellant's brief at 82–86; Appellant's reply brief at 11–14. He contends that the evidence was admissible under applicable Supreme Court precedent, namely, *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), and *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). I agree with his contention and believe that he is entitled to a new trial.

¶ 5 My analysis begins with the basic constitutional principle that "[a]n accused has a fundamental right to present evidence so long as the evidence is relevant and not excluded by an established evidentiary rule." *Commonwealth v. Ward*, 529 Pa. 506, 509, 605 A.2d 796, 797 (1992) (citing *Chambers v. Mississippi, supra*). Thus, once it is determined that proffered evidence is relevant, the United States Constitution requires that it be admitted unless an established evidentiary rule that advances a legitimate state interest requires its exclusion. *Holmes v. South Carolina, supra; Green v. Georgia, supra; Chambers v. Mississippi, supra.*

¶ 6 In *Chambers*, the defendant was convicted of murdering a police officer. Another party had confessed to the murder in writing and then repudiated the confession. That third party then made incriminating statements to other individuals. The defendant called the third party as a witness at trial but was prevented from cross-examining him with his prior verbal admissions under a state evidentiary rule that prohibited a party from impeaching his own witness.

¶ 7 The United States Supreme Court granted a new trial, concluding that the evidentiary rule served no legitimate purpose and deprived the defendant of a fair trial given that the oral confessions were critical to his defense and had been made under circumstances indicating their trustworthiness. The Court observed:

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. Mr. Justice Black, writing for the Court in *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948), identified these rights as among the minimum essentials of a fair trial:
>
>> A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against

---

17. Appellant's request for dismissal of the charges is premised upon application of the double jeopardy clause. He suggests that since he already has been tried four times, the Commonwealth should not be permitted to proceed with a fifth trial. However, as Appellant never has been acquitted of the homicide charge, the double jeopardy clause does not prevent retrial. *See Richardson v. United States*, 468 U.S. 317, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984).

him, to offer testimony, and to be represented by counsel.

*Id.* at 294, 93 S.Ct. 1038. The Court continued, "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* at 302, 93 S.Ct. 1038. Recognizing the hearsay implications in the defendant's evidence, the Court ruled as follows:

> Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

*Id.*

¶ 8 Also pertinent to my analysis is the decision in *Green v. Georgia, supra,* where at the death penalty stage of the proceeding, the defendant sought to introduce a statement made by his co-conspirator to a jailhouse snitch. The co-conspirator had admitted that he shot the victim while the defendant was elsewhere. The snitch's testimony was ruled inadmissible based upon application of the hearsay rule. The Supreme Court reversed, holding:

> Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony

was highly relevant to a critical issue in the punishment phase of the trial, ... and substantial reasons existed to assume its reliability. [The co-conspirator] made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of [the coconspirator] and a capital sentence. The statement was against interest, and there was no reason to believe that [the coconspirator] had any ulterior motive in making it.

*Id.* at 97, 99 S.Ct. 2150.

¶ 9 Also implicated in this case is the United States Supreme Court's recent pronouncement in *Holmes v. South Carolina, supra,* which Appellant cites in his reply brief since it was issued after Appellant's primary brief was filed. In that case, the defendant was convicted of murder, and the forensic evidence included the discovery of the defendant's handprint at the murder scene, the victim's DNA on the defendant's underwear, and the victim's blood on the defendant's shirt. In his defense, the defendant raised claims of planted evidence and improper testing and also sought to introduce proof that a third party had attacked the victim. That evidence included statements made by the third party that the defendant was innocent and that the third party had committed the crime. The exculpatory evidence was prohibited at trial based upon a state evidentiary rule which provided that a defendant may not introduce proof that a third party is guilty of a crime once the prosecution presents forensic evidence strongly supporting the defendant's guilt.

¶ 10 Acknowledging that the states have latitude under the Constitution to promulgate evidentiary rules excluding evidence in criminal trials, the Supreme Court nonetheless observed that this latitude has limitations:

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" [*Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)] (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413, (1984)). This right is abridged by evidence rules that "infringe upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" [*United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)] (quoting *Rock v. Arkansas,* 483 U.S. 44, 58, 107 S.Ct. 2704, 97 L.Ed.2d 37, (1987)).

*Id.* at 324–25, 126 S.Ct. 1727. The Court continued that state evidentiary rules are constitutionally invalid if they exclude pivotal defense evidence without serving any legitimate state interest or are disproportionate to the ends they are designed to promote.

¶ 11 In the present case, the following facts are relevant. There were two police reports regarding Musselwhite. The first report indicated that Stephanie Maddich informed police that Musselwhite, her former boyfriend, telephoned her at approximately 2:30 a.m. on April 18, 1986, five hours after the shooting. He sounded "very worried" and "very upset" and stated that he "was in the back seat of a car when the passenger in the front went be[r]serk and shot a rabbi or priest." Police Report, 5/13/86, at 1.

¶ 12 Police interviewed Musselwhite, and he admitted that he was in close proximity to the shooting during the pertinent time frame, but denied making the telephone call to Ms. Maddich. Police then obtained a search warrant for the telephone records of Musselwhite's residence, and those records confirmed that a telephone call to Ms. Maddich from Musselwhite's home was made five and one-quarter hours after the homicide occurred and that other telephone calls to her were made thereafter. *Id.* When confronted, Musselwhite admitted to police that "a few days after the murder, he telephoned an ex-girlfriend named Stephanie Maddich who had moved to New Jersey and told her that 'he did it.'" Police Report, 12/02/01, at 1. He then told police that he only made this admission to impress Ms. Maddich.

¶ 13 At his second and fourth trials, Appellant sought to present the testimony of Ms. Maddich regarding Musselwhite's statement the night of the murder. In his proffer, Appellant indicated that Ms. Maddich would testify that Musselwhite was "frantic" and "crying" and was asking her what to do and that she told him to go to police. N.T. Musselwhite Argument, 12/3/01, at 7. Appellant also sought to present Musselwhite as a witness; in his offer of proof, Appellant indicated that Musselwhite would admit informing the police that he told Ms. Maddich that he was the perpetrator of the crime but would then state that his admission was false.

¶ 14 The trial court denied admission of Musselwhite's two statements based upon application of the hearsay rule. Appellant complains that application of the hearsay rule in this instance violated his due process rights. Appellant's brief at 85. Appellant argues that there were substantial reasons to conclude that the testimony of Ms. Maddich and Musselwhite was reliable and were therefore admissible under *Chambers* and *Green.* In my view, this position is meritorious.

¶ 15 The proffered testimony was relevant herein because it was evidence that someone other than Appellant, either Mus-

selwhite or his unidentified companion, committed the murder. *Ward, supra* at 509, 605 A.2d at 797 ("[I]t is ... well-established that proof of facts showing the commission of a crime by someone else is admissible."). Further, I agree with Appellant's assertion that Musselwhite's statements placing blame for the murder on himself or another individual bore sufficient indicia of reliability or trustworthiness so as to require their admission into evidence under the due process clause.

¶ 16 As Appellant notes, Musselwhite's frantic telephone call on the night of the murder had "earmarks of reliability." Appellant's brief at 85. Like the statement at issue in *Green,* Musselwhite's statement to Ms. Maddich was spontaneously made to a close friend. There was no reason for him to fabricate that he had witnessed the murder. Moreover, there can be no doubt that Musselwhite actually witnessed this event. When Musselwhite told Ms. Maddich about the murder at 2:30 a.m., the details of the 9:15 p.m. murder had not been disseminated publicly. Musselwhite knew all of the significant details of the crime, and those facts could have been related only by someone who actually witnessed the crime. Specifically, he said that the shooting was unprovoked, had been committed by a front seat passenger, and the victim was a religious figure.

¶ 17 Indeed, Musselwhite's statement to Ms. Maddich on the night of the murder bore all the earmarks of trustworthiness exhibited by an excited utterance. Musselwhite was frantic when he made the call and did not simply relay the events of the evening in narrative form but rather sought Ms. Maddich's advice on his next course of action. Musselwhite had just viewed an extremely startling event, a cold-blooded murder of a religious person. Ms. Maddich described Musselwhite's emotional state as very nervous and upset.

She confirmed to Appellant's counsel that when he made the call, Musselwhite was crying and frantic while on the telephone and was uncertain as to what to do. *See Commonwealth v. Keys,* 814 A.2d 1256 (Pa.Super.2003) (discussing excited utterance exception to hearsay rule); Pa.R.E. 802(2).

¶ 18 The trial court herein concluded that the statement was not admissible under the excited utterance exception to the hearsay rule based upon *Commonwealth v. Upshur,* 764 A.2d 69 (Pa.Super.2000), where we upheld a trial court's decision to preclude the introduction of a statement made by an unidentified person to a police officer because there was no evidence establishing that the declarant actually viewed the criminal incident. The trial court in this case reasoned that there was no independent evidence that Musselwhite saw the crime. However, in my view, the fact that Musselwhite had knowledge of the details of the crime when the general public did not was sufficient to establish that he actually witnessed it. Thus, the court's application of *Upshur* to this case was error.

¶ 19 Appellant was also prohibited from presenting Musselwhite as an exculpatory witness. In his offer of proof, Appellant stated that Musselwhite would have confirmed that he admitted to police that he told Ms. Maddich that he committed the murder. He then would have testified that he actually did not commit the murder but was attempting to impress her. The trial court precluded this testimony also based upon application of the hearsay rule. That application was untenable as Appellant sought to present the testimony of the declarant himself, Musselwhite, rather than a person who heard the declarant confess to the crime. *Cf. Commonwealth v. Bracero,* 515 Pa. 355, 528 A.2d 936 (1987) (plurality) (defendant properly pre-

vented from calling witness to testify that a third party confessed to the crime).

¶ 20 In addition, there were strong indicia that Musselwhite was indeed connected to this murder. He admitted to police that he was in the vicinity of the murder on the night in question. He telephoned Ms. Maddich under extreme emotional duress, revealing details of a crime that had not yet been broadcast over the news, and then denied to police that he made the call. However, the fact that he contacted Ms. Maddich was substantiated by telephone records. Musselwhite then admitted to police that he had confessed to the crime.

¶ 21 In this case, it is critical to recall that while the Commonwealth effectively excluded the statements made by Musselwhite, it then successfully prosecuted Appellant based on the very same type of evidence, statements made to third parties. The preclusion of Musselwhite's statements, which bore significant indicia of reliability, served no legitimate state interest, especially in light of the fact that the Commonwealth's case rested on the same type of evidence it prevented Appellant from introducing at trial. The trial court's decision to preclude the Musselwhite evidence disproportionately infringed upon the right of the accused to present a complete defense. Thus, I believe that Appellant's Constitutional rights were violated, and he is entitled to a new trial.

¶ 22 Hence, I disagree with the majority's refusal to grant Appellant a new trial.