**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TERRY LOUISE HOLMES, | |
| Appellant | No. 1394 EDA 2014 |

Appeal from the Judgment of Sentence entered April 4, 2014,
in the Court of Common Pleas of Montgomery County,
Criminal Division, at No(s): CP-46-CR-0005569-2012

BEFORE:  ALLEN, LAZARUS, and MUNDY, JJ.

MEMORANDUM BY ALLEN, J.:                    **FILED DECEMBER 01, 2014**

Terry Louise Holmes ("Appellant") appeals from the judgment of sentence imposed after the trial court convicted her of theft by unlawful taking or disposition, theft by deception, receiving stolen property, unsworn falsification to authorities, and securing execution of documents by deception.[1]  Appellant's convictions arose from her tenant fraud relative to her residence in public housing administered by the Montgomery County Housing Authority ("MCHA") and funded by the United States Department of Housing and Urban Development ("HUD").

The trial court summarized the facts pertinent to this case as follows:

> In 2003, [Appellant] executed a Montgomery County Housing Authority Dwelling lease for 305 Linden Avenue, which

---

[1] 18 Pa.C.S.A. §§ 3921(a), 3922(a), 3925(a), 4904(a) and 4114(a).

is located within North Hills Manor. *Id*. at 21; Exh. C-5. She represented in the lease documents that the family members living at 305 Linden Avenue were herself and her daughters, Cassandra Holmes and Natasha Holmes. *Id*. at 23. She identified herself in the lease documents as the head of the household. *Id*. The lease, which was reviewed with [Appellant] when she signed it, included provisions regarding guests, overnight visitors, the procedures for adding an occupant to the residence and the effect any change in occupancy or occupant income may have on rental rates. *Id.* at 24-27; Exh. C-5, p. 5.

[Appellant] subsequently executed annual recertifications that require tenants to provide information regarding the occupants of the household and their income(s). *Id.* at 31. Relevantly, she reported in 2008 that the occupants of 305 Linden Avenue were herself, Cassandra Holmes and Natasha Holmes. *Id*. at 34. From 2009 through 2011, she identified herself and Natasha Holmes as the only occupants. *Id*. At no time did [Appellant] report that either her husband, Craig Holmes, Sr., or their son, Craig Holmes, Jr., resided at 305 Linden Avenue. *Id*.

Nevertheless, MCHA employee Valerie Yancey received an anonymous tip in her capacity as development manager at North Hills Manor that [Appellant] was in violation of her lease. Yancey worked in an office at 300 Linden Avenue, which is directly across the street from [Appellant's] residence. *Id*. at 19. She often saw Holmes Sr. throughout the development and going in and out of the residence. *Id*. at 38. She saw him inside the residence during two maintenance visits. *Id*. at 36-38. In addition, for almost a year beginning in late 2010 Yancey saw Holmes Sr. leave the residence every Thursday and Friday shortly before 7:00 a.m. *Id*. at 40-41. Holmes Sr. would drive away in a vehicle often parked in front of the residence. *Id*. at 42. Over that nearly year-long period, Yancey rode to work on Thursdays and Fridays with Fran Hibberd, an MCHA maintenance mechanic. *Id.* at 40-41. Hibberd, for his part, got to know Holmes Sr. from seeing him around North Hills Manor at least once a month and speaking with him both inside and outside the residence. *Id.* at 46-48.

Yancey referred the anonymous tip to MCHA's manager of public housing, Beth Wentzel. *Id*. at 53,55. A subsequent investigation by MCHA revealed that both Holmes Sr. and

Holmes Jr. were using 305 Linden Avenue as a mailing address. *Id.* at 56.

The Office of Inspector General eventually joined the investigation on behalf of HUD. A check of PennDot records linked Holmes Sr. and Holmes Jr. to the 305 Linden Avenue residence. (N.T., Suppression Hrg., 8/26/13, p. 10). The registration for a vehicle in Holmes Sr.'s name bore the 305 Linden Avenue address. *Id.* Holmes Sr., who worked for the U.S. Postal Service ("USPS"), listed 305 Linden Avenue as his address on a health benefits form received by his employer in January 2010. *Id*. at 11.

Income records from the USPS showed that Holmes Sr. had reported gross earnings of $50,343.46 in 2008, $54,582.03 in 2009, $43,072.28 in 2010 and $7,907.14 for the reported period of 2011. (N.T., Trial, 8/26/13, pp. 71-72). An investigation into Holmes Jr.'s employment status revealed that he had a couple of employers, with at least one of them having his address listed at 305 Linden Avenue. (N.T., Suppression Hrg., 8/26/13, p. 11).

HUD Special Agent Danny Barbat-Gonce eventually paid a daytime visit to [Appellant] at 305 Linden Avenue on October 14, 2011. (N.T., Trial, 8/26/13, p. 72). Barbat-Gonce began working as a HUD agent in 1991. She left that post around 1995 to work for the Treasury Department, and returned to HUD in 2003. (N.T., Suppression Hrg., 8/26/13, p. 8). Her duties include investigating fraud involving HUD programs. A "big part" of her job involves investigating tenant fraud, and she often has occasion to go out and speak to tenants about the make-up of their households. *Id*. at 8-9.

On the day of the visit, Barbat-Gonce was dressed in plain clothes. *Id*. at 12-13. She had a badge and gun in her possession. *Id*. at 13. She was accompanied by HUD Agent Dennis Madarang, who also was in plain clothes and in possession of a badge and gun. *Id*. at 14, 19-20. The agents knocked on the front door of the residence and were greeted by [Appellant]. *Id*. at 14. The agents identified themselves, showed [Appellant] their credentials and asked if they could speak with her about the certifications she had made to MCHA. *Id.*

[Appellant] agreed and the three moved into the living room. *Id*. at 14. She sat on a chair while the agents sat on an

adjacent couch about five to ten feet away. *Id*. at 15-16. Barbat-Gonce advised [Appellant] that she did not have to answer any questions, that the interview was voluntary and that [Appellant] could ask the agents to leave. *Id*. at 32-33. The agent did not provide *Miranda* warnings because she did not believe the interview was custodial. *Id*. at 35-36. [Appellant] was not placed under arrest, nor was she handcuffed. She agreed to speak with the agents and Barbat-Gonce inquired how long [Appellant] had lived in the residence and with whom she resided.

[Appellant] initially stated that only her daughter was living with her at the time. *Id*. at 17. When informed that driving and employment records linked her husband and son to the residence, [Appellant] admitted that her son had been living with her off and on and that Holmes Sr. had been there for the last five or six months. *Id*. at 17-18. The interview, which had a conversational tone, lasted about 15 minutes until [Appellant] terminated it and the agents left. *Id*. at 17-19.

Based on the information [Appellant] repeatedly provided to MCHA, she was receiving $2.00 per month to live in the residence. (N.T., Trial, 8/26/13, p. 60). Her monthly rental was $50.00, but she received a $52 credit for utilities. *Id*. Had Holmes Sr.'s occupancy and income been reported to MCHA, the agency would have received at least $27,870 in rent during the relevant time period based on a flat rent calculation. *Id.* at 61.

Trial Court Opinion, 8/7/14, at 2-6 (footnotes omitted).

On July 9, 2012, the Commonwealth charged Appellant with the aforementioned crimes. Appellant filed a motion to suppress her statements to the HUD agents. On August 26, 2013, the trial court convened a suppression hearing, after which it denied Appellant's suppression motion. The case proceeded to a bench trial, and the trial court rendered its guilty verdicts. On April 4, 2014, the trial court sentenced Appellant to three (3)

months to twenty three (23) months of incarceration. Appellant appealed.

Both the trial court and Appellant have complied with Pa.R.A.P. 1925.[2]

Appellant presents two issues for our review:

I.    Whether the trial court erred in denying [A]ppellant's Motion to suppress statements where the court erroneously found that [A]ppellant was not in custody at the time of the interrogation by HUD agents?

II.    Whether the trial court erred in finding [A]ppellant guilty of the charges as there was insufficient circumstantial evidence to support the finding of guilt in that no one could identify [A]ppellant's husband or son as residents of the apartment [A]ppellant lived at with her daughters?

Appellant's Brief a 4.

In her first issue, Appellant contends that the trial court erred in denying her suppression motion because she was subject to a custodial detention when she met with the HUD agents, who improperly failed to give her **Miranda**[3] warnings. Appellant specifically claims that "the HUD Agents, with badges and loaded guns, arrived at the home residence of [A]ppellant … and conducted an interrogation of [A]ppellant. The HUD Agents intended to use any information gained from that interrogation against [A]ppellant, and even confronted her with the evidence that they had found when she

---

[2] Judge Silow presided over Appellant's suppression motion and bench trial, while Judge Demchick-Allow presided over Appellant's sentencing. Because Appellant challenges the guilt phase of her case and not her sentence, Judge Silow authored the Pa.R.A.P. 1925(a) opinion.

[3] **Miranda v. Arizona**, 384 U.S. 436 (1966).

initially denied that [her husband and son] lived at her house."  Appellant's Brief at 17.  Appellant further asserts, "When confronted under these circumstances, it is reasonable to believe that [A]ppellant did not believe she had a choice but to permit them to enter and answer their questions."  *Id.* Upon review, we find Appellant's assertion completely unavailing.

Our standard of review of the trial court's denial of a suppression motion is as follows:

> An appellate court's standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  [Because] the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.  Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Reese*, 31 A.3d 708, 721 (Pa. Super. 2011) (citations omitted).  Moreover, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony.  The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." *Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. 2003) (citations omitted).

In Pennsylvania, there are three categories of interaction between the police and members of the public:   1) mere encounters, which are

- 6 -

characterized by the fact that the suspect has no official compulsion to stop or respond to the police, and which need not be supported by any level of suspicion; 2) investigative detentions, in which suspects are **required** to stop and submit to a period of detention, but are not subject to such coercive conditions to qualify as an arrest, and which must be supported by reasonable suspicion; and 3) arrests, or custodial detentions, which must be supported by probable cause. **Commonwealth v. Astillero,** 39 A.3d 353, 357-358 (Pa. Super. 2012) (emphasis supplied).

> To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved. To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable person innocent of any crime would have thought he was being restrained had he been in the defendant's shoes.

**Commonwealth v. Collins**, 950 A.2d 1041, 1046-1047 (Pa. Super. 2008) *quoting* **Commonwealth v. Reppert**, 814 A.2d 1196, 1201–1202 (Pa. Super. 2002). **See also Commonwealth v. Au**, 42 A.3d 1002, 1004 (Pa. 2012).

"To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved." **Collins**, 950 A.2d at

1046-1047. "To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred." *Commonwealth v. Strickler*, 757 A.2d 884, 889–90 (Pa. 2000) (internal citations and footnotes omitted). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might by compelled." *Commonwealth v. McClease*, 750 A.2d 320, 324–25 (Pa. Super. 2000) *quoting United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

Here, we find the trial court's reasoning both accurate and persuasive:

> [Appellant] claims her statements to the HUD agents should have been suppressed because she was in custody at the time she made them. This vague claim leaves this court to

- 8 -

guess that [Appellant] means she should have received *Miranda* warnings prior to the interview with the HUD agents.

Our Supreme Court has explained that:

> A person is in custody for *Miranda* purposes only when he is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. The U.S. Supreme Court has elaborated that, in determining whether an individual was in custody, the ultimate inquiry is … whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. The question of custody is an objective one, focusing on the totality of the circumstance, with due consideration given to the reasonable impression conveyed upon the person being questioned.

*Commonwealth v. Boczkowski*, 846 A.2d 75, 90 (2004) (internal quotation marks, citations and footnote omitted).

As detailed by the undersigned on the record at the suppression hearing, the evidence demonstrated that [Appellant] was not in custody during the in-home interview with HUD agents. More specifically,

> The interview was only 15 minutes, . . . the [Appellant] was advised that she didn't have to answer the questions, yet she did. [Appellant] was not handcuffed or transported anywhere else against her will, there were no threats or use of force at any time during the interrogation, the interview was conducted in a conversational tone and . . . the [Appellant], in fact, terminated the interrogation.

(N.T., Suppression Hearing, 8/26/13, p. 47). This court, therefore, correctly denied [Appellant's] motion to suppress because, based on the totality of the circumstances, she was not in custody at the time she made the statements.

In light of the evidence from the suppression hearing, [Appellant's] reliance on *Commonwealth v. Dewar,* 674 A.2d 714 (Pa. Super. 1996), was misplaced. There, the trial court granted the defendant's motion to suppress statements made in his home to state police. The Superior Court stated that it was

- 9 -

"constrained to conclude that appellee was in 'custody' when questioned" due to a lack of evidence regarding the duration of the detention or whether his freedom of movement had been restricted. *Id*. at 717. Here, in contrast, the evidence from the suppression hearing demonstrated that the interview in [Appellant's] home lasted only about 15 minutes, her freedom of movement was not restrained, she was informed that she did not have to answer questions, she ultimately terminated the interview and the HUD agents left without incident. Thus, *Dewar* provides [Appellant] with no relief.

Rather, this case bears more resemblance to *Commonwealth v. Busch*, 713 A.2d 97 (Pa. Super. 1998). There, the Superior Court reversed a trial court's decision to suppress un-*Mirandized* statements made by the defendant to two police detectives during questioning in his home. *Id*. at 102. The defendant, who was a suspect in a theft investigation, twice invited the detectives into his home when they arrived at his door. *Id*. at 101. The interviews occurred in the defendant's living room. *Id*. Neither interview lasted more than a half-hour. *Id*. The defendant's freedom of movement was not restricted. *Id*. During the second interview, the defendant asked the officers to leave and they did. *Id*. The Superior Court found these circumstances did not require *Miranda* warnings. *Id*. at 102. The circumstances in the instant case, similarly, do not compel a finding that [Appellant] was in custody when she spoke with the HUD agents.

Trial Court Opinion, 8/7/14, at 8-10. The trial court, as the fact-finder, further noted that "the evidence presented at trial amply demonstrated [Appellant's] guilt beyond a reasonable doubt, even had the statements not been admitted." ***Id.*** at 9, n.11. Accordingly, Appellant's first issue is meritless.

In her second issue, Appellant argues that "there was insufficient circumstantial evidence to support the finding of guilt in that no one could identify [A]ppellant's husband or son as residents of the apartment

[A]ppellant lived at with her daughters." Appellant's Brief at 18. Again, Appellant's issue is utterly meritless. In her one paragraph of argument, Appellant fails to cite any legal authority, and simply reargues the evidence submitted at trial. *Id.* It is well-settled that undeveloped claims will be deemed waived, and will not be considered on appeal. *See Commonwealth v. Tielsch*, 934 A.2d 81, 93 (Pa. Super. 2007); *Chapman-Rolle v. Rolle*, 893 A.2d 770, 774 (Pa. Super. 2006); Pa.R.A.P. 2119(a).

In the absence of our determination of waiver, the trial court additionally determined that Appellant waived her sufficiency claim because in her Pa.R.A.P. 1925(b) concise statement, Appellant "not only failed to specify the elements she is challenging on appeal, but also which conviction(s) she is challenging." Trial Court Opinion, 8/7/14, at 10, *citing Commonwealth v. Garland*, 63 A.3d 339 (Pa. Super. 2013). The trial court also determined that "had [Appellant] preserved a challenge to the sufficiency of the evidence, no relief would be due." Trial Court Opinion, 8/7/14, at 10-13. Given the foregoing, we decline to address Appellant's sufficiency issue any further.

In sum, Appellant's issues do not warrant relief. We therefore affirm her judgment of sentence.

Judgment of sentence affirmed.

- 11 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/1/2014