J-S59001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| STEPHEN EDWARD WEAVER, | |
| Appellant | No. 255 WDA 2014 |

Appeal from the Judgment of Sentence September 23, 2013
In the Court of Common Pleas of Bedford County
Criminal Division at No(s): CP-05-CR-0000207-2011
CP-05-CR-0000286-2011

BEFORE:  BOWES, DONOHUE, AND FITZGERALD,* JJ.

MEMORANDUM BY BOWES, J.:                 **FILED DECEMBER 08, 2015**

Stephen Edward Weaver appeals from the judgment of sentence of nineteen to fifty-six years imprisonment that was imposed after he was convicted by a jury of one count each of rape, involuntary deviate sexual intercourse by forcible compulsion ("IDSI"), and aggravated indecent assault and twenty-one counts of indecent assault.  We affirm.

This appeal concerns two criminal cases, which were consolidated for purposes of trial.  At criminal action number 207 of 2011, Appellant was convicted of rape, IDSI, and twenty counts of indecent assault.  These charges arose from his sexual abuse of his stepdaughter, A.B., when she was fourteen to sixteen years old.  At criminal action number 286 of 2011, a jury found Appellant guilty of aggravated indecent assault, and indecent

---

* Former Justice specially assigned to the Superior Court.

assault based on an incident involving his biological daughter S.W. The trial court aptly summarized the evidence supporting the convictions in question. As to A.B., the evidence was as follows:

[A.B.] testified she was born in 1987 and was raised in the Defendant's residence with her Mother and younger sister. Beginning with her 14th birthday in 2001 the Defendant became increasingly physical in his contact with her. (T. 12/10/12, page 69). Eventually it led to the Defendant licking and touching her breasts as a daily event. (T. 12/10/12, page 77). During those times the witness testified that the Defendant told her that her Mother would not have sex with him anymore; that the Defendant said he felt unwanted and without him "we were kind of up the creek." (T. 12/10/12, page 76, line 9 and 10). That after she turned 16 the Defendant began to treat her like "his live-in girlfriend the wife didn't know about." (T. 12/10/12, page 77). [A.B.] stated the Defendant frequently discussed having sex with her (T. 12/10/12, page 80), and encouraged her to engage in sexual intercourse with her boyfriend. (T. 12/10/12, page 81). The Defendant told her if she had sex with her boyfriend he then could have sex with her. The Defendant explained that her first time "you should do that with somebody you love." (T. 12/10/12, page 81, line 7). Finally the witness submitted in August of 2003 when she engaged in intercourse with her current boyfriend. Upon her return home, the Defendant was alone in the house and asked her about the experience. [A.B.] stated she was sore. The Defendant then immediately removed her clothing and performed oral sex on her. (T. 12/10/12, page 86, lines 22-24). The witness conceded she did not shove the Defendant away, but had in the weeks prior to the encounter told the Defendant he was her father and "people don't do this." (T. 12/10/12, page 89). On her return home[,] she told the Defendant she was "swollen" and sex would be "painful". (T. 12/10/12, page 89). When the Defendant did not heed this argument the witness stated[,] "I just didn't know how to solve it". (T. 12/10/12, page 89, line 19-20). After performing oral sex[,] the Defendant then engaged in vaginal intercourse. The Defendant did not wear a condom and ejaculated on the witness's leg. (T. 12/10/12, page 90-91). The Defendant told her "we're all in trouble now, and if your mother found out she would get really sick." (T. 12/10/12, page 92).

This comment was directed to the fact the witness's mother suffers from rheumatoid arthritis which was made worse by stress. After that first occasion[,] the Defendant and the witness engaged in penile vaginal intercourse and oral sex on a regular basis but the witness could only recall additional incidents specifically. However, the witness was confident that she had submitted to the Defendant 20 times in each case consisting of oral sex following by vaginal intercourse with the Defendant's penis. (T. 12/10/12, page 101, line 11-20). The witness stated, "it was very much kind of a routine." (T. 12/10/12, page 10, line 22-23).

Trial Court Opinion, 10/29/14, at 5-6.

There was a single incident involving S.W., who testified as follows:

Likewise with the younger sister, [S.W.] testified that when she was 16 years of age[,] the Defendant engaged her in a conversation regarding a lack of sexual activity between himself and the witness's mother. The Defendant asked her to do "certain things" for him and she refused. The Defendant and the witness argued about the subject for approximately 15 minutes until she noticed the Defendant was becoming angry. The witness then stated, . . . "so, I just went along with it out of fear." The Defendant told her to give him a "hand job" and when she replied she didn't know how to do that he put her hand on his penis. The Defendant then had the witness lean back and inserted two fingers in her vagina. The witness told the Defendant his actions were causing her discomfort. The Defendant continued for approximately 20 minutes, until a car door slammed outside and the Defendant stopped. As noted, when the Defendant stated his desire to initiate the contact the witness told him it was wrong, that it was incest and that she didn't want to it. (T. 12/10/12, pages 204-205). The witness told [A.B.], her sister, the next day; subsequently she was confronted by the Defendant who told her that [A.B.] had confronted him about the incident. The Defendant reminded her that if he was forced to leave the home the family would be without a paycheck and her mother would lose her health insurance. (T. 12/10/12, pages 209-210). Based on the above testimony[,] a jury could fairly conclude that the Defendant used psychological and intellectual force plus a display of anger to compel the witness's submission after she had clearly stated her

opposition to the acts. The jury could conclude she reacted out of fear. Based on the cases described above the evidence was sufficient to show both compulsion and non-consent.

*Id*. at 7-8.

In addition, Appellant made an inculpatory statements to police. **See** N.T. Trial (2nd day), 12/11/12, at 43-46. Specifically, Appellant admitted that he had a sexual relationship with his stepdaughter A.B, but insisted that A.B. initiated the sex and that it was consensual. Appellant also confessed to the sexual contact with S.W., but maintained that he examined her vagina after she told him that she had a lump on it and asked him to check it. Appellant claimed that S.W. grabbed his penis and stroked it while he was checking for the lump.

Following his convictions, Appellant was referred to the Sexual Offenders Assessment Board ("SOAB"). Thereafter, he was adjudicated a sexually violent offender and sentenced to nineteen to fifty-six years incarceration. This appeal followed denial of Appellant's post-sentence motion. Appellant raises these issues for our review:

[1.] Whether or not the evidence presented was sufficient to convict the Appellant with regard to each element of the crimes charged as well the charged dates of said crimes, as argued on pages 196-208 of Day 3 of the trial transcript?

[2.] Whether the guilty verdicts were against the weight of the evidence?

[3.] Whether or not the trial court erred when it denied Appellant's motion to suppress the initial statement of the Appellant when his waiver of rights was involuntary due to

coercion by the government in the form of being gassed, starved, and not having slept for a period of 36 hours?

[4.] Whether the subsequent statement of the Appellant should have been suppressed as fruit of the poisonous tree because Appellant's first statement was involuntary?

[5.] Whether the trial court erred by permitting the Commonwealth to consolidate the criminal information at cases numbers 207 and 286 for 2011 violations of Pennsylvania Rule of Evidence 404 and in violation of Pennsylvania Rule of Criminal Procedure 563 and 582?

[6.] Whether the trial court erred in permitting the Commonwealth in introducing evidence of the Defendant's failure to come out of his home in violation of the Defendant's 5th Amendment right not to incriminate himself as set forth in the U.S. Constitution and Article I, Section 9 of the Pennsylvania Constitution which affords greater rights to individuals? Further, the trial court erred in failing to declare a mistrial when the Commonwealth cross examined the Defendant regarding his right not to incriminate himself as argued by trial counsel on pages 166-167 of the trial transcript on Day 3 of trial?

[7.] Whether the trial court erred in permitting the Commonwealth, over the Defendant's motion to suppress and objection, to introduce evidence of the observations of police when they entered and searched the Defendant's home without probable cause and without a warrant and there were no exigent circumstances and no reason to believe the Defendant was in the home.

[8.] Whether the trial court erred pursuant to Pennsylvania Rule of Evidence 403 in allowing testimony that was more prejudicial than probative in regard to the facts and circumstances of the Defendant's arrest; specifically, tear gassing of the residence, the make shift wall, etc., and all testimony related thereto?

[9.] Whether the trial court erred in allowing testimony and allowing the Commonwealth to introduce all of the Defendant's weapons (guns and machetes) found in his home because:

a. said evidence and testimony was irrelevant in a sexual assault trial? And

b. said evidence and testimony was more prejudicial than probative pursuant to Pennsylvania Rule of Evidence 403?

c. Said evidence was admitted in violation of Pa.R.E. 404, as it was used to prove Defendant's criminal character?

[10.] Whether the trial court erred in its failure to declare a mistrial after the Defendant was seen in custody by jurors at jury selection and, more specifically, by at least one juror who was ultimately selected to decide Defendant's guilt or innocence?

[11.] Whether the trial court erred in allowing statements of the victim in regard to alleged physical, and intellectual, moral, emotional or psychological force either expressed or implied in pressuring her to have sex as argued by trial counsel on pages 152 through 157 of the trial transcript on Day 1 of the trial and further, in failing to grant a mistrial after allowing said statements?

[12.] Whether the trial court erred in permitting the Commonwealth to introduce evidence of the Defendant's arrest as consciousness of guilt and further allowing the jury to be given an instruction regarding the alleged consciousness of guilt?

[13.] Whether the trial court erred in deeming the Defendant a sexually violent predator by clear and convincing evidence?

[14.] Whether the trial court erred in failing to merge counts 1 and 21 which arose out the same act and whose elements were identical; further, the verdict slip over Defendant's objection did not differentiate between what act constituted rape in count 1 and what act constituted IDSI in count 21; thus, the jury did not have the ability to differentiate the two?

[15.] Whether the trial court erred in allowing or not allowing the jury charges over Defendants request or objection on pages 190-198 of the trial transcript Day 3 of the jury trial regarding the following:

a. Forcible compulsion (charged allowed)?

b. Circumstantial Evidence (charged allowed)?

c. Defendant special interest (charged allowed)?

d. Consciousness of guilt (charged allowed) (also addressed in issue F above)?

e. False in One/False in All (charge not allowed)?

[16.] Whether the trial court erred in denying a mistrial when the Commonwealth indicated to the jurors it was their job to find the Defendant guilty? Further, the Commonwealth admitted it was a mistake and the court indicated it would give a curative instruction on page 263 of the trial transcript Day 3 following closing arguments and never did?

Appellant's brief at 6-9.

Appellant's first contention is a sufficiency claim. We observe: "In reviewing a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt." *Commonwealth v. Leatherby*, 116 A.3d 73, 79 (Pa.Super. 2015).

Appellant raises three distinct issues as to the sufficiency of the evidence supporting his convictions: 1) the evidence was insufficient to support the jury's finding that he committed the forcible compulsion element of the crimes of rape, IDSI, and indecent assault by forcible compulsion; 2) the dates of the offenses, as outlined in the informations, were too broad to

permit him to defend these cases; and 3) the evidence established that the offenses were committed outside of the dates set forth in the criminal informations.

Appellant, as noted, challenges the sufficiency of the evidence as to one element of his rape, IDSI and indecent assault convictions. Appellant was convicted of rape under 18 Pa.C.S. § 3121(a)(1), which states, "A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant . . . [b]y forcible compulsion." His conviction of IDSI was pursuant to 18 Pa.C.S. § 3123(a)(1), providing, "A person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant . . . [b]y forcible compulsion[.]" Deviate sexual intercourse is, "Sexual intercourse per os or per anus between human beings and any form of sexual intercourse with an animal. The term also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." 18 Pa.C.S. § 3101. Appellant also was adjudicated guilty of committing indecent assault, which, in pertinent part, is defined as follows:

> A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:
>      . . . . .

- 8 -

(2) the person does so by forcible compulsion[.]

18 Pa.C.S. § 3126 (a)(2). Forcible compulsion is, "Compulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." 18 Pa.C.S. § 3101.

All of these convictions pertain to A.B. as a victim. She testified that Appellant placed his mouth on her vagina and engaged in sexual intercourse with her on multiple occasions after August 2003. The only question before this Court is whether the sexual abuse was perpetrated by means of forcible compulsion, which, according to its express definition, does not require the use of physical force. Rather, as outlined in the statutory definition, intellectual, moral, emotional or psychological force can satisfy this element of a crime.

Our decision in **Commonwealth v. Gonzalez**, 109 A.3d 711 (Pa.Super. 2015), is instructive. Therein, we rejected a defendant's position that there was not sufficient proof of forcible compulsion for purposes of his conviction of rape, even though he was not physically resisted by the victim and did not physically restrain or strike her. The victim therein was a paraplegic and told the defendant, whom she was dating, that she did not want to have sexual intercourse before she was married. When the defendant began to engage in sexual intercourse with her, she told him no, and the defendant had to move her legs in order to commit the offense.

This Court observed that forcible compulsion does not require the use of physical force. We continued that a "determination of forcible compulsion rests on the totality of the circumstances," and that the following list of factors, which are not exclusive, are used to determine the existence of forcible compulsion:

> the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, **domination** or custodial control over the victim, and whether the victim was under duress.

*Id*. at 721 (emphasis in original) (quoting **Commonwealth v. Rhodes**, 510 A.2d 1217, 1226 (Pa. 1986)). We concluded therein that, given the victim's statements and the fact that the defendant had to move her legs, the element of forcible compulsion was present.

In this case, the victim of the rape, IDSI, and indecent assault by forcible compulsion was A.B. There was a vast age difference between A.B., who was fourteen when the abuse started and sixteen when Appellant began to repeatedly engage in oral sex and rape the girl. Appellant had been her stepfather from birth and thus had, for all her life, been in a position of authority, domination, and custodial control over A.B. She told Appellant that people did not have sex with their family, thus informing him that she did not want to engage in the activity. A.B. also reported that she and her mother were economically dependent upon Appellant and that Appellant

- 10 -

reminded her of that fact. Appellant pressured A.B. to submit to his sexual activities due to her mother's purported lack of interest in them. The victim therefore was under financial and emotional duress to allow Appellant to perform these activities. Thus, all of the pertinent factors were present herein, and we conclude that the evidence was sufficient to sustain the element of forcible compulsion as to the convictions in question.

We now address Appellant's complaint that the offenses occurred outside the dates outlined in the information. As to A.B., Appellant was convicted of one count each of rape and IDSI and twenty counts of indecent assault. The information in that action stated that offenses occurred between April 11, 2001, and April 11, 2005. A.B. testified that Appellant began to touch and lick her breast every day after she turned fourteen, on April 11, 2001. A.B. also stated specifically that Appellant engaged in oral sex and sexual intercourse with her in August 2003, immediately after she had consensual sex for the first time with her boyfriend. Therefore, the offenses were not committed outside the time period outlined in the information.

The information as to S.W. charged Appellant with one count of aggravated indecent assault and indecent assault by force and stated that the acts occurred between September 3, 2005, and September 3, 2006, when S.W. turned seventeen. That victim testified that the sexual abuse occurred after she turned sixteen. Thus, Appellant's conviction of the

offenses of indecent assault by force and aggravated indecent assault as to S.W. were within the dates outlined in the information.

Appellant next complains that the prosecution failed to fix the date of the offenses with sufficient particularity so that he could defend this case. Appellant relies upon **Commonwealth v. Devlin**, 333 A.2d 888 (Pa. 1975), which holds that due process requires the prosecution to fix the date of the commission of the offense with reasonable certainty. In **Devlin**, the defendant was accused of one count of IDSI with a mentally-challenged man. The information stated that this single offense occurred at some point during a fourteen-month period.

In concluding that due process was violated by the lack of specificity in the information as to the date of the offense, the **Devlin** court observed that this broad timeframe rendered it impossible for the defendant to level an alibi defense and also severely impaired the defendant's ability to impeach the victim. However, our Supreme Court also observed that there is flexibility in this area:

> [W]e cannot enunciate the exact degree of specificity in the proof of the date of a crime which will be required or the amount of latitude which will be acceptable. Certainly the Commonwealth need not always prove a single specific date of the crime. Any leeway permissible would vary with the nature of the crime and the age and condition of the victim, balanced against the rights of the accused. Here, the fourteen-month span of time is such an egregious encroachment upon the appellant's ability to defend himself that we must reverse.

*Id.* at 892 (footnote and citations omitted).

The critical factor in **Devlin** was that there was a single instance of abuse. In **Commonwealth v. Groff**, 548 A.2d 1237 (Pa.Super. 1988), we examined **Devlin**. Therein, the defendant was accused of sexually abusing a six-year-old once during the summer of 1985. We concluded that the date of the offense was proven with sufficient particularity and distinguished **Devlin** based upon the victim's youth and the fact that the Commonwealth had been able to narrow timeframe of the crime to the summer of 1985, even though the victim lived with the defendant from August 1983 through September 1985.

Therein, we also observed that under the prevailing law, "the Commonwealth would clearly prevail if appellant had been convicted of repeatedly abusing the victim during the summer of 1985. Case law has established that the Commonwealth must be afforded broad latitude when attempting to fix the date of offenses which involve a continuous course of criminal conduct." **Id**. at 1242 (citation omitted); **Commonwealth v. Robinson**, 462 A.2d 840 (Pa.Super. 1983)). More recently, in **Commonwealth v. G.D.M, Sr.**, 926 A.2d 984, 990 (Pa.Super. 2007), we reaffirmed that "the due process concerns of **Devlin** are satisfied where the victim . . . can at least fix the times when an ongoing course of molestation commenced and when it ceased."

In the present case, A.B. was able to outline when an ongoing course of molestation began and ended. It started when she was fourteen and

ended when she was eighteen. S.W. was able to fix the date of molestation as occurring when she was sixteen years old. Thus, we reject Appellant's invocation of *Devlin*.

Appellant's second issue is that the verdicts were against the weight of the evidence. Specifically, he maintains that his actions with A.B. "were consensual" and the incident involving S.W. was "done for a good faith medical reason." Appellant's brief at 22. Additionally, Appellant maintains that both the victims were lying about the abuse in order to deprive him of his property. *Id*.

When we review a weight-of-the-evidence challenge, we do not actually examine the underlying question; instead, we examine the trial court's exercise of discretion in resolving the challenge. *Commonwealth v. Leatherby*, 116 A.3d 73 (Pa.Super. 2015). This type of review is necessitated by the fact that the trial judge heard and saw the evidence presented. *Id*. Simply put, "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Id*. at 82. A new trial is warranted in this context only when the verdict is "so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Morales*, 91 A.3d 80, 91 (Pa. 2014).

- 14 -

Of equal importance is the precept that, "The finder of fact—here, the jury—exclusively weighs the evidence, assesses the credibility of witnesses, and may choose to believe all, part, or none of the evidence. **Commonwealth v. Sanchez**, 36 A.3d 24, 39 (Pa. 2011) (citation omitted) **see also Commonwealth v. Page**, 59 A.3d 1118, 1130 (Pa.Super. 2013) ("A determination of credibility lies solely within the province of the factfinder."); **Commonwealth v. Blackham**, 909 A.2d 315, 320 (Pa.Super. 2006) ("The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses. . . . It is not for this Court to overturn the credibility determinations of the fact-finder.").

A.B. reported that she did not consent to Appellant's sexual activity, and S.W. established that Appellant had no good faith medical reason for inserting his fingers into her vagina and forcing her to touch his penis. It was the jury's function to determine if these two witnesses were credible. Hence, we conclude that the trial court did not abuse its discretion in rejecting Appellant's weight claim and finding that the verdict did not shock its sense of justice.

Appellant's third complaint is that the trial court erred in not suppressing his statement to police at the time of his June 2, 2011 arrest and he makes that argument together with his fourth contention, which is that "any subsequent statements should have been suppressed, also."

- 15 -

Appellant's brief at 25. Appellant maintains that, when he was interrogated, he had not eaten for two days, he was tired, and he was suffering from the effects of tear gas and that his confession therefore was not voluntary.

The applicable standard of review is as follows:

An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Commonwealth v. Jones*, 2121 A.3d 524, 526-27 (Pa.Super. 2015) (quoting *Commonwealth v. Jones*, 605 188, 988 A.2d 649, 654 (Pa. 2010)).

The following facts are pertinent. A.B. and S.W. went to police in May 2011, years after the abuse, because A.B. was about to have a baby, and they wanted to protect the unborn child from Appellant. On May 20, 2011, Pennsylvania State Trooper Terry L. Summers was assigned the investigation into the allegations. After interviewing the two victims, in

accordance with standard protocol, Trooper Summers went to speak with Appellant to obtain his response. Trooper Summers arrived at Appellant's residence at 9:30 a.m. on June 1, 2011. After repeatedly knocking on the door and receiving no response, he called Appellant's employer and discovered that Appellant was scheduled to work at 3:00 p.m. Trooper Summers left but returned at 2:00 p.m. so he could intercept Appellant on his way to work. Appellant never left the residence so Trooper Summers called his employer again, discovering that Appellant had called off work for personal, family reasons.

Trooper Summers telephoned Donna Weaver, Appellant's then estranged wife, who told the trooper that Appellant had been telephoning the two victims and that they were afraid that he was going to harm them. Ms. Weaver and the two girls were not at the home, and Ms. Weaver said that the caller identification on the telephones of A.B. and S.W. indicated that the calls were emanating from inside Appellant's residence. Finally, Ms. Weaver told Trooper Summers to be cautious since Appellant had many firearms hidden throughout the house. Trooper Summers interviewed neighbors and ascertained that Appellant owned two vehicles, which were both parked outside the residence. That police officer concluded that Appellant was inside the residence and was ignoring him. While other police watched Appellant's residence, Trooper Summers obtained an arrest warrant for Appellant and returned to execute it.

After hours of asking Appellant to leave the residence through a loud speaker, a special forces unit of police entered the home the morning of June 2, 2011, after using remote cameras, a robot, and tear gas. Police could not locate Appellant, and turned the house over to Donna, who was a co-owner. She discovered Appellant hiding inside the house behind a false wall and took him to the police barracks on June 2, 2011.

About ninety minutes after Appellant arrived at the police station, Trooper Summer read Appellant his **Miranda** rights, and Appellant said that he understood them and executed a written waiver. Trooper Summers reported that, while Appellant appeared to be a little dirty, he was otherwise fine and did not appear fatigued. Appellant did not ask for the interview to cease. Appellant made the described statements that he had a sexual relationship with his stepdaughter A.B. and engaged in the sexual contact described by S.W.

On appeal, Appellant suggests that his confession should be suppressed in that he had not eaten, slept or bathed for two days and was still "suffering from the effects of tear gas." Appellant's brief at 28. Our Supreme Court has enunciated the legal standard for determining whether an inculpatory statement is voluntary, as follows:

> The test for determining the voluntariness, and thus the admissibility, of an accused's statement is the totality of the circumstances surrounding the statement. The mere fact that there is some passage of time between when an accused is arrested and when he or she gives an inculpatory statement

does not constitute grounds for suppression of the statement. Numerous factors should be considered under a totality of the circumstances test to determine whether a statement was freely and voluntarily made: the means and duration of the interrogation, including whether questioning was repeated, prolonged, or accompanied by physical abuse or threats thereof; the length of the accused's detention prior to the confession; whether the accused was advised of his or her constitutional rights; the attitude exhibited by the police during the interrogation; the accused's physical and psychological state, including whether he or she was injured, ill, drugged, or intoxicated; the conditions attendant to the detention, including whether the accused was deprived of food, drink, sleep, or medical attention; the age, education, and intelligence of the accused; the experience of the accused with law enforcement and the criminal justice system; and any other factors which might serve to drain one's powers of resistance to suggestion and coercion.

*Commonwealth v. Martin*, 101 A.3d 706, 724–725 (Pa. 2014).

In this case, Appellant had been in police custody for only one and one-half hours when he made his statement. Trooper Summers said that Appellant did not appear hungry or sleep deprived. That officer gave Appellant his *Miranda* warnings, Appellant said that he understood them, and Appellant executed a written waiver of his rights. There was no evidence that Trooper Summers engaged in any type of coercion or duress. Hence, we conclude that the trial court properly concluded that Appellant's June 2, 2011 statements to police were voluntarily given.

Appellant makes the additional assertion that his "second statement should have been suppressed also." Appellant's brief at 28. That phrase is the extent of his extrapolation on that subject matter. Appellant fails to

- 19 -

indicate when the statement was made, the contents of the statement, or why it was involuntary. He also does not cite any case authority on the subject. As our Supreme Court observed in **Commonwealth v. Perez**, 93 A.3d 829, 837 (Pa. 2014), the rules of appellate procedure "set forth the fundamental requirements every appellate brief must meet." The Court admonished litigants:

> The briefing requirements scrupulously delineated in our appellate rules are not mere trifling matters of stylistic preference; rather, they represent a studied determination by our Court and its rules committee of the most efficacious manner by which appellate review may be conducted so that a litigant's right to judicial review may be properly exercised. Thus, we reiterate that compliance with these rules by appellate advocates is mandatory.

*Id*. at 837-38 (citation omitted). Therein, the Court ruled that "to the extent [an] appellant's claims fail to contain developed argument or citation to supporting authorities and the record, they are waived[.]" *Id*. at 838; *see also Commonwealth v. Spotz*, 18 A.3d 244 (Pa. 2011) (claim that consisted of a phrase that contained no argument as to why evidentiary ruling was erroneous was unreviewable and waived); *Commonwealth v. Tielsch*, 934 A.2d 81, 93 (Pa.Super. 2007) (undeveloped assertions are waived); *Commonwealth v. Snyder,* 870 A.2d 336, 342 (Pa.Super. 2005) ("Undeveloped claims are waived."). The argument relating to Appellant's second confession, being wholly undeveloped, is therefore waived.

Appellant's fifth allegation is that the two criminal actions were improperly consolidated. Appellant's brief at 28. "Whether to join or sever offenses for trial is within the trial court's discretion and will not be reversed on appeal absent a manifest abuse thereof, or prejudice and clear injustice to the defendant." *Commonwealth v. Wholaver*, 989 A.2d 883, 898 (Pa. 2010). Pa.R.Crim.P. 582 governs consolidation of separate informations and provides, in pertinent part:

> (1) Offenses charged in separate indictments or informations may be tried together if:
>
> (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
>
> (b) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582(A)(1).

Appellant complains that the offenses in question would not have been admissible in a separate trial for the other. We disagree. Evidence of other crimes is inadmissible at a trial only when that proof is introduced to "show the defendant's bad character or propensity to commit crime." Pa.R.E. 404(b)(1). However, evidence of other crimes is allowed to be introduced in a variety of circumstances, including when offered to prove motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). Additionally, there is a common

scheme design or plan exception to the preclusion of prior bad acts evidence, and we applied that exemption in *Commonwealth v. Aikens*, 990 A.2d 1181 (Pa.Super. 2010).

In *Aikens*, we ruled that Appellant's prior rape of a daughter, who was an adult at trial, was admissible in his trial for the sexual abuse of his younger daughter under the common scheme or plan exception. We found the following similarities between the two crimes rendered the prior rape properly admitted into evidence. Both victims were the defendant's daughters and were of similar ages when the sexual abuse occurred. The defendant initiated the contact during an overnight visit in his home, and he began the sexual abuse by showing the girls pornographic movies.

In *G.D.M., Sr., supra* 984, we also applied the common scheme or plan exception when upholding the trial court's decision to allow the jury to hear about a prior criminal conviction. The defendant was being tried for holding his son's penis twice and making the victim hold his penis once. The incidents occurred at the defendant's residence. The trial court had allowed proof that the defendant was convicted for sexually abusing his daughter when she was between thirteen and fourteen years old. Specifically, at his home, the defendant repeatedly made the girl massage his genital area. We held that the prior criminal conduct was admissible since the victims were the defendant's children, the abuse occurred inside the house, and the abuse of the boy began shortly after the abuse of the girl ceased.

Similarly, in **Commonwealth v. Luktisch**, 680 A.2d 877 (Pa.Super. 1996), the defendant had been convicted of molesting his stepdaughter. At trial, the court permitted his biological daughter to testify about sexual abuse that the defendant had perpetrated on her when she was a child. On appeal, the defendant challenged the admission of his daughter's testimony. We concluded that the two incidents were sufficiently similar to be admissible under the common scheme or plan exception since the pattern of molestation was the same in the two cases and the victims were similar in age when it was perpetrated.

These cases apply herein. Appellant sexually abused his stepdaughter, whom he helped raise from birth, and his daughter. A.B. was sixteen when she was raped, and S.W. was the same age when Appellant forced her to touch his penis and placed his fingers inside her vagina. Appellant's abuse of S.W. began five months after he stopped assaulting A.B. and occurred inside the home. Thus, Appellant's sexual contact with S.W. would have been admissible at a trial for his abuse of A.B. and *vice versa*, and, we conclude that the trial court did not abuse its discretion in allowing the two criminal cases to be consolidated for trial.

Appellant combines his argument on issues six and twelve. Appellant's brief at 31. He avers that the trial court should not have allowed the Commonwealth to introduce evidence of Appellant's refusal to exit his house on June 1, 2011, and to cross-examine him on the fact that he hid from

police rather than come out and speak with them. He maintains that the proof and impeachment violated his Fifth Amendment right against self-incrimination. Appellant also contends that the fact that he hid did not evidence consciousness of guilt.

Appellant relies upon **Commonwealth v. Molina**, 104 A.3d 430 (Pa. 2014) (plurality). Therein, a detective, who had been informed that the defendant was involved in a murder, spoke with the defendant by telephone and asked him about the victim's disappearance. The defendant denied having anything to do with the matter, and, when asked, refused to come to the police station. That conversation was used as substantive evidence of the defendant's guilt. Our Supreme Court ruled that during the call, the defendant had invoked his right to remain silent under the Pennsylvania Constitution. The **Molina** court ruled that use of the defendant's pre-arrest silence as evidence of guilt violated the defendant's right against self-incrimination.

**Molina** involves materially different circumstances than the case at bar. Simply put, Appellant never spoke with Trooper Summers at all. He certainly never invoked his right to remain silent by saying that he did not want to speak with police, as was the case in **Molina**. Rather, Trooper Summers came to Appellant's residence in the morning to interview Appellant so that Appellant could respond to the accusations leveled by his daughter and stepdaughter. Appellant never answered the door and never

- 24 -

said he would not come to the police barracks. After Trooper Summers ascertained that Appellant was inside the house, he obtained an arrest warrant, which he then executed. Using a loud speaker, police repeatedly asked Appellant to exit the house, and Appellant again failed to respond. He did not say he would not speak with police. A special unit of police entered the house to arrest Appellant. Appellant concealed himself.

The law is clear that, "When a person knows that he is wanted in connection with a criminal investigation, and flees or conceals himself, such conduct is admissible as evidence of consciousness of guilt. Evidence of flight or concealment can be established through eyewitness testimony." *Commonwealth v. Hudson*, 955 A.2d 1031, 1036 (Pa.Super. 2008). Hence, Appellant's concealment of his whereabouts was properly admitted as substantive evidence of guilt, and the Commonwealth was permitted to cross-examine Appellant about his actions on June 1, 2011. Appellant's act of hiding was not an invocation of his right to remain silent, and Appellant provides no case authority providing that the prosecution may not introduce evidence of a defendant's concealment under the Fifth Amendment. Hence, we reject his sixth and twelfth contentions.

Appellant's next assertion is that the Commonwealth should not have been able to introduce evidence of what the police observed when they entered his house. Appellant's justification for that position is that the raid violated his constitutional rights since it was conducted without a search

warrant and since police had no reason to believe that he was located therein. Appellant's brief at 35. We conclude that the facts refute the existence of a constitutional violation. Police were in possession of an arrest warrant when they entered Appellant's residence in order to execute it. They also knew that he was located in the home. Specifically, Trooper Summers spoke with Donna Weaver and she told him that Appellant was calling the victims from the telephone inside the residence. Trooper Summers also spoke with neighbors who told him that Appellant had two vehicles, which Trooper Summers observed parked outside the house. Thus, contrary to Appellant's contention, police did have a warrant and did have cause to believe that Appellant was inside the house. Since police were lawfully attempting to execute the arrest warrant, they were properly inside the residence.

Appellant presents his argument as to issues eight and nine together. Appellant's brief at 35-38. He argues that the trial court erroneously admitted evidence "of the circumstances of the Defendant's arrest," including that he used a make-shift wall to hide. *Id*. at 35.[1] Appellant's specific allegations are that the proof was irrelevant and more prejudicial than probative. In this section of his brief, Appellant also objects to the fact

_____

[1] Appellant objected to the Commonwealth's request to introduce all the evidence of Appellant's concealment from police. N.T. Trial (1st day), 10/10/12, at 4.

that evidence was produced about the weapons discovered inside his house. He maintains that this proof was irrelevant and prohibited prior crimes evidence.

We first note that, "A trial court's decision to allow the admission of evidence is a matter within its sound discretion, and we will reverse that decision only when it has been shown that the trial court abused that discretion." *Commonwealth v. Briggs*, 12 A.3d 291, 336 (Pa. 2011). The following facts are pertinent to the concealment issue. In its opening statement, the Commonwealth told the jury that it was going to hear the following. Appellant did not answer the door for Trooper Summers, and Appellant, over the course of many hours, ignored requests that he leave the house made through loud speakers. A special police unit entered the residence after a using remote surveillance devices, flash bombs, a robot, and tear gas. Police did not locate Appellant. Donna Weaver and A.B.'s biological father entered the house to secure it when they discovered Appellant hiding behind a fake wall and took him to police. To police, Appellant admitted, "Yeah, I was there the whole time. I was hiding in the wall with a gun. I figured [out] why you guys were here, and I was, I didn't want you to get me." N.T. Jury Trial (1st day), 12/10/12, at 48.

The prosecutor told the jury that it could consider the concealment as consciousness of guilt. *Id*. at 49. The district attorney maintained that Appellant "knew he did something wrong. And that's why he was hiding

- 27 -

from the police. That's why he was hidden in a wall. That's why he's armed with a gun." *Id*. at 49-50. In response, the defense maintained that Appellant's concealment was not consciousness of guilt but instead, he was terrorized by police actions and hid out of fear. *Id*. at 54.

After opening remarks, the Commonwealth presented witnesses who outlined Appellant's efforts to avoid detection. State Trooper Summers testified about his efforts, as described *supra*, to interview and then serve the arrest warrant on Appellant on June 1, 2011.

State Police Lieutenant Chris D. Yanoff testified about the deployment of a special police tactical unit known as the Special Emergency Response Team, which was used to enter the house. Lieutenant Yanoff was in charge of the team and explained that it can be activated only after specified conditions have been satisfied. Lieutenant Yanoff delineated that the unit was used in this case because Appellant had been inside the house for hours ignoring demands announced over a loud speaker that he exit the house and because police were aware both that the house may have been booby-trapped and that "there were multiple weapons in the house," including a machine gun. *Id*. at 173.

Lieutenant Yanoff continued that, once the team arrived on the scene, he began to telephone the residence repeatedly. Next, two windows were broken and police announced that, if Appellant would answer the telephone, they would provide a surrender plan. Then, the unit used a noise flash

diversionary device called a flash pan that is used to gain someone's attention. Thereafter, they continued to hail Appellant over the loud speaker and telephone the residence. After breaking two additional windows, police threw a remote camera inside the house and used a pole camera to surveil the inside. Neither device detected Appellant. Police continued to telephone the home and to ask Appellant to exit it through the loud speaker.

Police then used tear gas and sent a robot to breach the front door. The robot, which was equipped with a camera, examined the first floor and detected nothing. Police followed but could not locate Appellant. After Appellant was found by his estranged wife, Lieutenant Yanoff examined the false wall that had concealed Appellant's whereabouts. He described the hiding place to the jury.

Appellant asserts that this concealment evidence was irrelevant and unduly prejudicial. We disagree. Appellant maintained at trial that the victims were lying, that the allegations were instigated by his estranged wife, and that he was innocent of criminal wrongdoing. Appellant engaged in amazing and successful efforts to avoid police apprehension. He went so far as to build a hidden compartment inside his house to avoid detection. As outlined *supra*, when a defendant conceals his whereabouts from police, that action is a relevant consideration as it is pertinent to establish that the defendant was aware that he had committed a criminal act.

The events surrounding police efforts to locate Appellant and his successful avoidance of police detection were highly probative of his guilt. This proof demonstrated that Appellant knew he had committed acts warranting his arrest. The fact that the evidence was prejudicial to Appellant did not render it inadmissible. "[E]ven inflammatory evidence may be admissible if it is relevant and helpful to a jury's understanding of the facts and the probative value outweighs the prejudicial effect." *Commonwealth v. Serge*, 896 A.2d 1170, 1182 (Pa. 2006). We conclude herein that the probative value of this proof was not outweighed by its prejudicial impact, and that the trial court did not abuse its discretion in permitting the evidence concerning Appellant's concealment.

In this portion of his brief, Appellant also assails the trial court's decision to allow evidence concerning the weapons found on the property. Appellant notes that he did not use a gun during the commission of the crimes and argues that the proof was inadmissible as irrelevant and prohibited prior bad acts evidence. Appellant's brief at 37-38. We conclude that Appellant opened the door to the evidence about the weapons. "A litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence." *Commonwealth v. Nypaver*, 69 A.3d 708, 716 (Pa.Super. 2013)*.*

In opening remarks, Appellant noted that the district attorney had made "a big deal about this raid on the defendant's house." N.T. Trial (1st

day), 12/10/12, at 53. He observed that the raid occurred "because Donna Weaver told the police that [Appellant] was armed and dangerous, and had guns hidden behind picture frames from the wall and everywhere all over the house." *Id.* Appellant then insisted that police "never found the like" and did not establish that "he was dangerous." *Id*.

Then, during his direct testimony, Appellant denied having weapons and explosive devices throughout the house. N.T. Trial, 12/12/12 (3rd day), at 61. These statements were factually inaccurate.[2] Pursuant to a search warrant issued following Appellant's arrest, police found four handguns, a shotgun, two rifles, and a MAK-90, which is a variant of an AK 47 machine gun. Appellant himself described the guns and attempted to cast them as paltry weapons that were old, patched up, or inoperable. *Id*. at 62-69. In response, the Commonwealth was permitted to introduce the weapons into evidence. Appellant opened the door to this proof by denying that he was armed and dangerous, maintaining that Donna Weaver was lying when she told police to proceed with caution since there were guns hidden throughout the house, and attempting to diminish the significance of the weaponry

---

[2] We note that Donna Weaver also found ten pipe bombs in the house, called police, and a bomb unit had to defuse the devices. Appellant was separately charged with possession of weapons of mass destruction. The trial court prohibited the jury from hearing about those bombs.

Hence, we conclude that the trial court did not abuse its discretion in allowing the guns to be introduced into evidence.

Appellant's tenth averment is that the trial court erroneously refused to grant him a mistrial after he "was seen in custody by jurors at jury selection." Appellant's brief at 39. We evaluate this position under the following standards:

> [T]he review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will ... discretion is abused. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.

***Commonwealth v. Manley***, 985 A.2d 256, 267-68 (Pa.Super. 2009) (citations and quotation marks omitted).

Appellant claims entitlement to a new trial because some of the jurors saw a deputy sheriff when the deputy "escorted the defendant out of the courtroom[.]" N.T. Jury Selection, 12/4/12, at 136, 193. Appellant maintains that "the inescapable conclusion was that [Appellant] was in custody and escorted because he was a criminal." Appellant's brief at 39. "It is settled law that a mere accidental observation of a defendant in handcuffs outside a courtroom by a juror does not, without more, require the granting of a mistrial[.]" ***Commonwealth v. Valerio***, 712 A.2d 301,

302 (Pa.Super. 1998). In this case, Appellant was not even shackled, handcuffed, restrained, or in prison garb. We conclude that the trial court correctly denied a new trial due to this brief sighting by jurors of Appellant walking alongside a deputy sheriff.

Appellant next suggests a mistrial was warranted based on a single leading question. That inquiry, which was addressed to A.B. was, "In emotional terms, how would you describe the type of force that [Appellant] your father, used to compel you to have sex with him?" N.T. Trial, 12/10/12, at 152. The victim responded that it was a question of survival since the family could not afford to live without Appellant's income and her mother would get sick. The question asked the witness to provide pertinent evidence relative to the issue of forcible compulsion. Thus, the response adduced from the inquiry did not result in the jury's consideration of improper evidence or rendering a verdict on an incorrect basis. One leading question that produces admissible evidence is not grounds for a mistrial.

Appellant's thirteenth allegation is that the trial court improperly found that Appellant was a sexually violent predator ("SVP").

> The determination of a defendant's SVP status may only be made following an assessment by the Sexual Offenders Assessment Board ("SOAB") and hearing before the trial court. In order to affirm an SVP designation, we, as a reviewing court, must be able to conclude that the fact-finder found clear and convincing evidence that the individual is a sexually violent predator. As with any sufficiency of the evidence claim, we view all the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth. We will reverse a trial

- 33 -

court's determination of SVP status only if the Commonwealth has not presented clear and convincing evidence that each element of the statute has been satisfied.

The standard of proof governing the determination of SVP status, i.e., "clear and convincing evidence," has been described as an "intermediate" test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt.

The clear and convincing standard requires evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

*Commonwealth v. Morgan*, 16 A.3d 1165, 1168 (Pa.Super. 2011) (citation omitted). We are not permitted to re-weigh the factors that are involved in an SVP determination; our function is to determine if the Commonwealth's evidence was sufficient to support the trial court's conclusion that a defendant was an SVP. *Commonwealth v. Meals*, 912 A.2d 213 (Pa. 2006).

In the present case, the Commonwealth presented the testimony of Herbert Edwin Hays, who had been employed as a member of the Sexual Offender's Assessment Board ("SOAB") for fifteen years. Mr. Hays had Bachelor of Arts and Masters of Arts degrees in counseling psychology from Valley Christian University, a Bachelor of Science degree in clinical psychology from the University of Pittsburgh, and a Master of Arts degree in counseling from Liberty University. In addition, he had over 2,000 hours of specialized training in the field of assessment, treatment, and management

of sex offenders and was a certified sex offender treatment provider. Before

he started to work for the SOAB, Mr. Hays was a therapist specializing in the

assessment, treatment, and management of sex offenders at the Ministries

of Eden and Eden Forensic Institute. After reviewing the facts of these cases

and the pertinent law, Mr. Hays concluded that Appellant was a sexually

violent predator and diagnosed him with paraphilia not otherwise specified.

In challenging the sufficiency of the evidence supporting the trial

court's adjudication, Appellant merely examines the difference in the

opinions proffered by Mr. Hays and Appellant's expert witness Dr. Robert

Mark Wettstein and suggests his witness was more worthy of belief than Mr.

Hays. However, the trial court chose to credit Mr. Hays' testimony, which

was sufficient to support a conclusion that Appellant is an SVP by clear and

convincing evidence. We therefore reject this allegation and affirm the trial

court's finding based upon its convincing rationale, as expressed at the SVP

hearing:

> I'd indicate that I thought the reports of both experts were very thoughtful. I thought they were very well thought out, and very complete. I think each expert was expressing their heartfelt opinion based on the evidence, in the case as they saw it. They did however differ...
> . . . .
> Mr. Hays and Dr. Wettstein differ over the finding of whether there was a diagnosis or a finding of paraphilia NOS in the case. Dr. Wettstein pointed out he feels it's a finding that's sometimes overly used. But in reviewing both reports and reviewing my notes of the testimony, his determination that it was not appropriate to find Mr. Weaver as suffering from paraphilia NOS is based in part on his feeling that the evidence

was too scanty to show that the condition existed for a period over six months.  Now, I think the difference of the experts on this in part had to do that neither were available at trial.  Both relied on reports and so forth to make their determination.

However, the verdict in this case included 20 counts, 20 convictions for indecent assault.  And the witnesses' testimony at trial, Commonwealth witnesses supported these criminal actions, the indecent assault and the other convictions took place over a period of time well in excess of six months.  The doctor's own definition of paraphilia includes non–consent persons and forcible compulsion is a basis of each of the offenses.  It is one of the elements in each of the offenses, these convictions.  The Court therefore accepts that the Commonwealth has established by clear and convincing evidence Mr. Hays' finding of a mental abnormality, specifically paraphilia NOS, a congenital or acquired condition.

Further, having accepted that finding it appears clear that this is a lifetime condition and that the condition overrides Mr. Weaver's own volitional controls.  Given that he committed these acts with both a biological daughter and a step-daughter, the Court accepts the opinion of Mr. Hays and his finding that the conduct is likely to reoccur if the conditions are replicated.  There is, that is there being a situation where Mr. Weaver is in a situation of trust with young girls.

Finally, as to the predatory nature of the conduct, we are also persuaded by Mr. Hays by the requisite standard that the conduct was predatory.  Meaning no disrespect to Dr. Wettstein.  We highly respect him, he's an excellent professional.  Dr. Wettstein's definition of grooming seems somewhat limited.  His description of money, bribes, or alcohol or drugs certainly are means of grooming a child but experience shows what better method to groom a young girl to have sexual intercourse with an older man than repeated sexual acts committed on the person over a period of time.  These convictions in this case demonstrate this was predatory behavior based on sexualization of the relationship with his conduct with these children.

Therefore, we make a finding that by clear and convincing evidence [Appellant is an SVP].

N.T. SVP Hearing and Sentencing, 9/4/13, at 141-45. We further observe that Mr. Hays did, contrary Appellant's claim, opine that Appellant would be at risk for re-offending based upon his mental abnormality. *Id.* at 79. This testimony was sufficient on that question. *Morgan*, *supra*.

Appellant's next averment is that the crimes of IDSI and rape should have merged for sentencing purposes. The issue of whether "convictions merge for sentencing is a question implicating the legality of Appellant's sentence. Consequently, our standard of review is *de novo* and the scope of our review is plenary." *Commonwealth v. Baldwin*, 985 A.2d 830, 833 (Pa. 2009). Section 9765 of title 42 outlines when sentences merge:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

As articulated by our Supreme Court in *Baldwin*, *supra* at 933: "The statute's mandate is clear. It prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other."

A person commits rape when "the person engages in sexual intercourse with a complainant . . . [b]y forcible compulsion." 18 Pa.C.S. §

3121(a)(1). IDSI occurs when a "person engages in deviate sexual intercourse with a complainant . . . [b]y forcible compulsion[.]" 18 Pa.C.S. § 3123(a)(1). Deviate sexual intercourse, includes, *inter alia*, "Sexual intercourse per os or per anus[.]" 18 Pa.C.S. § 3101. Rape and IDSI do not merge because they contain different elements. Rape requires that a vagina be penetrated by a penis, which IDSI does not, whereas IDSI requires a vagina to be contacted with a mouth or an anus to be contacted with a penis, which is not an element of rape.

Additionally, in this case, the rape and IDSI convictions were premised upon different criminal acts. Appellant raped A.B. when he placed his penis inside her vagina and he committed IDSI when he placed his mouth on her vagina. These were separate acts, and the crimes did not merge for sentencing purposes for that reason as well.

Appellant's fifteenth complaint is that the trial court erred in refusing two jury instructions that he requested and in disseminating three improper instructions. We note that, "A trial court's denial of a request for a jury instruction is disturbed on appeal only if there was an abuse of discretion or an error of law." ***Commonwealth v. Johnson***, 107 A.3d 52, 89 (Pa. 2014).

Herein, Appellant first complains that the trial court failed to instruct the jury on "significant factors" that are to be used in making a determination of whether there was forcible compulsion. Appellant's brief at

47. Appellant outlines that these factors include the respective ages of the victim and the defendant, the mental and physical conditions of the victim and the defendant, the atmosphere and setting where the incident occurred, the extent to which the defendant was in a position of authority, domination or custodial control over the victim, and whether the victim was under duress. *Id*. However, the trial court did give the exact charge that Appellant suggests was omitted:

> Significant factors to be weighed in determining if there was sufficient forcible compulsion, or threat of such forcible compulsion including intellectual moral, or emotional, or psychological force of compulsion include the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting which the incidents are alleged to have taken place, the extent to which the accused may have been in a position of authority, domination, or custodial control over the victim, and whether the victim was under duress. This list of possible factors is by no means conclusive, or exclusive, but provides examples for you to better understand what we mean by forcible compulsion.

N.T. Trial, 10/12/12, at 288. Appellant's argument is therefore specious.

Appellant also complains about the trial court's refusal to give an instruction about "false in one, false in all," which is premised upon the Latin maxim "*falsus in uno, falsus in omnibus*." Appellant's brief at 49. The charge reads in full:

> If you decide that a witness deliberately testified falsely about a material point that is, about a matter that could affect the outcome of this trial, you may for that reason alone choose to disbelieve the rest of his or her testimony. But you are not required to do so. You should consider not only the deliberate

falsehood but also all other factors bearing on the witness's credibility in deciding whether to believe other parts of his[/]her testimony.

Pennsylvania Suggested Standard Jury Instruction (Criminal) § 4.15

Herein, A.B. made conflicting statements about when certain of the offenses occurred. Additionally, a witness presented by Appellant, Terri Huntsman, reported that A.B. told her that "at first [the sexual contact between A.B. and Appellant] wasn't consensual, then it was consensual." N.T. Trial, 12/11/12, at 112. Ms. Huntsman also said that A.B. told her that Donna Weaver was behind the accusations and that they were all "a whole bunch of bulls__ and lies." *Id*. at 115.

While the court declined to give the false in one/false in all charge, it specifically addressed A.B.'s inconsistent statements:

> You've heard evidence in this case by a witness that [A.B.] made a statement on an earlier occasion that was inconsistent with her present testimony. You may, if you choose, regard this evidence as proof of the truth of anything that the witness said in the earlier statement. You may also consider this evidence to help you judge the credibility and weight of testimony given by the witness at this trial. When you judge the credibility and weight of testimony, you're deciding whether to believe the testimony and how important you think it is.

N.T. Trial, 12/12/12, at 281-82; *see* Pennsylvania Suggested Standard Jury Instructions (Criminal) 4.08A.

Additionally, the court disseminated significant instructions about witness credibility, offering guidance on how to judge the credibility of witnesses in accordance with the language of Suggested Standard Jury

Instructions (Criminal) §§ 4.09 and 4.17. *See* N.T. Trial, 121/12/12, at 278-283. Since these jury instructions encompass the concepts involved in false in one/false in all charge, a new trial is not warranted. ***Commonwealth v. Vicens-Rodriguez***, 911 A.2d 116 (Pa.Super. 2006) (when a full and complete charge is given on how a jury is to assess the credibility of witnesses, there is no reversible error when a court fails to give the false in one/false in all instruction).

In connection with his fifteenth issue, Appellant also suggests that the circumstantial evidence and consciousness of guilt instructions should not have been given to the jury and that one of the instructions improperly shifted the burden of proof herein. As analyzed above, the fact that Appellant concealed his whereabouts did evidence consciousness of guilt under the applicable law. That proof was also circumstantial evidence. Hence, those two instructions were properly given.

Appellant's complaint regarding the burden of proof relates to a charge that the trial court gave on his credibility. Appellant argues that the trial court stripped him of the presumption of innocence by noting that he had a vital interest in this case. Specifically, the court informed the jury, "Mr. Weaver took the stand as a witness. In considering the defendant's testimony you are to follow the general instructions I have you for judging the credibility of any witness. You should not disbelieve the defendant's testimony merely because he is the defendant." N.T. Trial (3rd day),

- 41 -

12/12/12, at 282. The court continued that the jury could "consider the fact that he has a vital interest in the outcome of this trial." *Id*.

We conclude that this statement did not improperly shift the burden of proof to the defendant or strip him of the presumption of innocence. The jury was clearly and unequivocally instructed on the Commonwealth's burden of proof and the presumption of innocence. *Id*. at 269-70 (stating that a defendant is presumed innocent and that it is the Commonwealth's burden to prove otherwise). The trial court was quite explicit in this respect:

> It is not the defendant's burden to prove that he is not guilty. Instead it is the Commonwealth that always has the burden of proving each and every element of the crime charged. And the defendant is guilty of that crime beyond a reasonable doubt. I'll repeat that because it bears repeating. It is not the defendant's burden to prove that he is not guilty. Mr. Weaver has no obligation to do that. Instead it is the Commonwealth that always has the burden of proving each and every element of the crime charged, and that Mr. Weaver is guilty of that crime beyond a reasonable doubt.
>
> A person accused of a crime is not required to present evidence or to present anything in his or her own defense. If the Commonwealth's witness' evidence fails to meet its burden, then your verdict must be not guilty. On the other hand, if the Commonwealth's evidence is not proved beyond a reasonable doubt that the defendant is guilty, then the verdict should be not guilty. That is the Commonwealth's evidence does prove beyond a reasonable doubt that the defendant is guilty, then your verdict should be guilty.

*Id*. at 274-75; *see also id*. at 275 (defining reasonable doubt). Thus, we reject Appellant's claim he was denied the presumption of innocence when

the trial court noted that the jury could consider Appellant's special interest in the case when assessing his credibility.

Appellant's final position is that the trial court should have granted a mistrial after the Commonwealth, during summation, mistakenly told the jury it was their job to find Appellant guilty of the crimes in question. *See id*. at 262 ("And your job, as jurors now, is to look at the evidence and find him guilty of every single crime he's charged with.") After Appellant objected to this remark, the Commonwealth said that, if it did make that statement, it did so mistakenly. *Id.* 265. The trial court immediately gave a curative instruction to jury.

> As I told you folks before: Listen to the . . . . arguments of counsel. If they're persuasive to you, be guided by them. But what they tell you about the facts if they disagree with your recollection of the facts, you've got to abide by your own recollection. What I tell you about the law you must be guided on points of law. Because I am the Judge of the law.

*Id*. at 263.

It is settled that prosecutorial error during argument is not grounds for a new trial "unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." *Commonwealth v. Paddy*, 800 A.2d 294, 316 (Pa. 2002). In order to warrant a mistrial due to misconduct, the event must be prejudicial. As we observed in *Commonwealth v. Judy*,

978 A.2d 1015, 1019 (Pa.Super. 2009), "the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, assess the degree of any resulting prejudice."

In the present case, the jury was immediately given a curative instruction that the argument of counsel could not be considered as the applicable law and that the judge would instruct it on the legal standards to be employed. Then, the jury was repeatedly told that it had to acquit Appellant if it found that the evidence was insufficient to establish his guilt beyond a reasonable doubt. Hence, we conclude that, in light of its subsequent instructions, the trial court did not abuse its discretion in refusing to grant a mistrial after the Commonwealth mistakenly told the jury that its job was to convict Appellant.

Judgment of sentence affirmed.

Judge Donohue joins this memorandum.

Justice Fitzgerald concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/8/2015</u>